**I.LAN SYSTEMS, INC., Plaintiff,**

**v.**

**NETSCOUT SERVICE LEVEL CORP., Defendant.**

**No. CIV.A.00–11489–WGY.**

United States District Court, D. Massachusetts.

Jan. 2, 2002.

Lee Carl Bromberg, Erik Paul Belt, Bromberg & Sunstein, Boston, MA, for I.LAN Systems, Inc., Plaintiff.

Scott A. Roberts, Andrea C. Kramer, Sullivan, Weinstein & McQuay, P.C., Boston, MA, for NextPoint Networks, Inc., Netscout Service Level Corporation, Defendants.

*MEMORANDUM*

YOUNG, Chief Judge.

Has this happened to you? You plunk down a pretty penny for the latest and greatest software, speed back to your computer, tear open the box, shove the CD–ROM into the computer, click on "install" and, after scrolling past a license agreement which would take at least fifteen minutes to read, find yourself staring at the following dialog box: "I agree." Do you click on the box? You probably do not agree in your heart of hearts, but you click anyway, not about to let some pesky legalese delay the moment for which you've been waiting. Is that "clickwrap" license agreement enforceable? Yes, at least in the case described below.

## I. INTRODUCTION

The plaintiff, i.LAN Systems, Inc. ("i.LAN"), helps companies monitor their computer networks. The defendant, NetScout Service Level Corp., formerly known as NextPoint Networks, Inc. ("NextPoint"), sells sophisticated software that monitors networks. In 1998, i.LAN and NextPoint signed a detailed Value Added Reseller ("VAR") agreement whereby i.LAN agreed to resell Next-Point's software to customers. This dispute concerns a transaction that took place in 1999.

i.LAN claims that for $85,231.42 it purchased the unlimited right to use Next-Point's software, replete with perpetual upgrades and support, whereby it effectively could rent, rather than sell, Next-Point's software to customers. In support of its argument, i.LAN points to the purchase order associated with the transaction. NextPoint, in response, points to the 1998 VAR agreement and the clickwrap license agreement contained in the software itself to reach a different conclusion.

The parties continued their relationship for several months without confronting their conflicting interpretations of the 1999 purchase order, but eventually the disagreement erupted into litigation. i.LAN filed a complaint that alleges, among other things, breach of contract and violation of Massachusetts General Laws Chapter 93A. The complaint properly invokes the Court's diversity jurisdiction, 28 U.S.C. § 1332(a)(1). *See* Compl. ¶¶ 1, 2, 10.

i.LAN quickly took the offensive and brought a motion for summary judgment, Fed.R.Civ.P. 56(a). i.LAN argued that it should be awarded specific performance—in particular, perpetual upgrades of Next-Point's software and unlimited support. Pl.'s Mot. at 2–3. The Court heard oral

argument on i.LAN's motion and took the matter under advisement. Soon after, NextPoint brought a cross-motion for summary judgment, Fed.R.Civ.P. 56(b), the subject of this memorandum. NextPoint argued that even if i.LAN's allegations were true, the clickwrap license agreement limits NextPoint's liability to the price paid for the software, in this case $85,231.42. Def.'s Mot. at 2. The Court heard oral arguments on NextPoint's motion and soon after ruled in favor of NextPoint. This memorandum explains why.

## II. DISCUSSION

Before turning to NextPoint's clickwrap license agreement, the stage must be set. First, the Court will identify the set of rules by which to judge this dispute. Next, the Court will examine what is at stake, in particular i.LAN's claim for specific performance and NextPoint's limitation-of-liability defense. Finally, the Court will address the enforceability of the clickwrap license agreement.

### A. What Law Governs?

### 1. Precedence of the 1998, 1999, and Clickwrap Agreements

Three contracts might govern this dispute: the 1998 VAR agreement, the 1999 purchase order, and the clickwrap license agreement to which i.LAN necessarily agreed when it installed the software at issue. The key question for purposes of this memorandum is how the 1998 and 1999 agreements affect the clickwrap license agreement.

■ The clickwrap license agreement states that it does not affect existing or subsequent written agreements or purchase orders.[1] The language might be

---

1. In particular, the clickwrap license agree-

ment provides a limited exception to its inte-

read to mean that the clickwrap license agreement is a nullity if a purchase order already exists, but that reading is not the natural one. The natural reading is that to the extent the 1998 VAR agreement and 1999 purchase order are silent, the clickwrap license agreement fills the void.

### 2. Common Law vs. UCC

Two bodies of contract law might govern the clickwrap license agreement: Massachusetts common law and the Uniform Commercial Code ("UCC") as adopted by Massachusetts. Article 2 of the UCC applies to "transactions in goods," UCC § 2–102, Mass. Gen. Laws ch. 106, § 2–102, but "unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future *sale* of goods," *id.* § 2–106(1) (emphasis added). Indeed, the title of Article 2 is "Sales" and the definition of "goods" assumes a sale: "goods" is defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." *Id.* § 2–105(1). The purchase of software might seem like an ordinary contract for the sale of goods, but in fact the purchaser merely obtains a *license* to use the software; never is there a "passing of title from the seller to the buyer for a price," *id.* § 2–106(1). So is the purchase of software a transaction in goods? Despite Article 2's requirement of

a *sale*, courts in Massachusetts have assumed, without deciding, that Article 2 governs software *licenses*. *See Novacore Techs., Inc. v. GST Communications Corp.*, 20 F.Supp.2d 169, 183 (D.Mass. 1998) (Saris, J.), *aff'd*, 229 F.3d 1133, 1999 WL 33117239 (1st Cir.1999); *VMark Software, Inc. v. EMC Corp.*, 37 Mass.App.Ct. 610, 611 n. 1, 642 N.E.2d 587 (1994); *USM Corp. v. Arthur D. Little Sys., Inc.*, 28 Mass.App.Ct. 108, 119, 546 N.E.2d 888 (1989). *See generally* Lorin Brennan, *Why Article 2 Cannot Apply to Software Transactions*, 38 Duq. L.Rev. 459, 545–77 (2000); Mark A. Lemley, *Intellectual Property and Shrinkwrap Licenses*, 68 S. Cal. L.Rev. 1239, 1244 n. 23 (1995).

Given the cases above, and others to the same effect, i.LAN argues that the UCC should govern the 1999 purchase order and clickwrap license agreement. NextPoint does not disagree with the idea that the UCC might apply to software purchases in general, but under NextPoint's theory of the case, the 1998 VAR agreement is most important to this dispute, and that agreement predominately concerns *services*, rather than the sale of goods. NextPoint, therefore, argues that the UCC should not govern any part of this dispute. *See, e.g., Cambridge Plating Co. v. Napco, Inc.*, 991 F.2d 21, 24 (1st Cir.1993) (considering "predominate factor, thrust, or purpose" of contract).

gration clause:

> This License Agreement does not affect any existing written agreement between Licensee and NEXTPOINT and may be superseded by a subsequent written agreement signed by both Licensee and NEXTPOINT. Except as indicated in the prior sentence, this License Agreement constitutes the entire agreement between NEXTPOINT and Licensee with respect to the use and license of the Licensed Products, and hereby supersedes and terminates any prior agreements or understandings relating to such subject matter, including but not limited to any evaluation or beta test licenses granted by NEXTPOINT to Licensee. No addendum, waiver, consent, modification, amendment or change of the terms of this Agreement shall bind either party unless in writing and signed by duly authorized officers of Licensee and NEXTPOINT. *Terms and conditions as set forth in any purchase order which differ from, conflict with, or are not included in this License Agreement, shall not become part of this License Agreement unless specifically accepted by NEXTPOINT in writing.*

Def.'s App. tab 8 (emphasis added).

■ To the extent it matters—and given the facts of this case, it likely does not—the Court will examine the clickwrap license agreement through the lens of the UCC. Admittedly, the UCC technically does not govern software licenses, and very likely does not govern the 1998 VAR agreement, but with respect to the 1999 transaction, the UCC best fulfills the parties' reasonable expectations.

In Massachusetts and across most of the nation, software licenses exist in a legislative void. Legal scholars, among them the Uniform Commissioners on State Laws, have tried to fill that void, but their efforts have not kept pace with the world of business. Lawmakers began to draft a new Article 2B (licenses) for the UCC, which would have been the logical complement to Article 2 (sales) and Article 2A (leases), but after a few years of drafting, those lawmakers decided instead to draft an independent body of law for software licenses, which is now known as the Uniform Computer Information Transactions Act ("UCITA").[2] So far only Maryland and Virginia have adopted UCITA; Massachusetts has not. Accordingly, the Court will not spend its time considering UCITA. At the same time, the Court will not overlook Article 2 simply because its provisions are imperfect in today's world. Software licenses are entered into every day, and business persons reasonably expect that *some* law will govern them. For the time being, Article 2's familiar provisions—which are the inspiration for UCITA—better fulfill those expectations than would the common law. Article 2 technically does not, and certainly will not in the future, govern software licenses, but for the time being, the Court will assume it does.

## B. What Is at Stake?

### 1. Specific Performance

More than anything else, i.LAN wants specific performance—in particular, perpetual upgrades of NextPoint's software and unlimited support. Assuming the clickwrap license agreement is enforceable, NextPoint argues that the agreement prohibits specific performance as a remedy. In the alternative, NextPoint argues that specific performance is inappropriate under the UCC.

Section 4 of the clickwrap license agreement states, "NEXTPOINT'S LIABILITY FOR DAMAGES TO LICENSEE FOR ANY CAUSE WHATSOEVER, REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION, SHALL BE LIMITED TO THE LICENSE FEES PAID FOR THE LICENSED PRODUCT." Def.'s App. tab 8. From this provision, NextPoint concludes that money damages are the only possible remedy. An equally plausible reading of the provision, however, is that the limitation only applies to "damages," not equitable remedies. Indeed, section 6 of the agreement states, "[E]ach party shall have the right to institute judicial proceedings against the other party ... in order to enforce the instituting party's rights hereunder through reformation of contract, specific performance, injunction or similar equitable relief." *Id.* On balance, sections 4 and 6 cut against NextPoint's argument that the clickwrap license agreement prohibits specific performance as a remedy.

That being said, the law does not permit specific performance simply because a contract does not prohibit it. The UCC provides, in relevant part:

§ 2–716. Buyer's Right to Specific Performance or Replevin.

---

**2.** As one would expect, drafts of UCC Revised Article 2, UCC Article 2B, and UCITA are available on the Internet. *See* <http://www.law.upenn.edu/bll/ulc/ulc_frame.htm>.

(1) Specific performance *may* be decreed *where the goods are unique* or in other proper circumstances.

(2) The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.

UCC § 2–716, Mass. Gen. Laws ch. 106, § 2–716 (emphasis added). Although the UCC also allows specific performance in "other proper circumstances," i.LAN has not argued that the circumstances here are proper. Instead, i.LAN has argued that NextPoint's software is unique, a determination left to the discretion of the Court. *See* UCC § 2–716 cmt. 1; *cf., e.g., McCarthy v. Tobin*, 429 Mass. 84, 89, 706 N.E.2d 629 (1999) (applying common law).

The UCC commentary states that the UCC "seeks to further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale." UCC § 2–716 cmt. 1. "Specific performance is no longer limited to goods which are already specific or ascertained at the time of contracting. The test of uniqueness under this section must be made in terms of the total situation which characterizes the contract." *Id.* cmt. 2. One court has restated the test for specific performance as follows: "Basically courts now determine whether goods are replaceable as a practical matter—for example, whether it would be difficult to obtain similar goods on the open market." *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F.Supp.2d 919, 926 (N.D.Ill. 1999). *See generally* Andrea G. Nadel, Annotation, *Specific Performance of Sale of Goods Under UCC § 2–716*, 26 A.L.R.4th 294 (1983 & Supp.2000).

Before turning to the facts of this case, the Court considers the facts of other cases, which are instructive. No published decision in Massachusetts has applied UCC section 2–716, but three decisions are notable. In the first and most recent case, the First Circuit, applying Maine common law but looking to UCC section 2–716 for guidance, awarded specific performance in a case involving a minor-league baseball team. *Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214 (1st Cir.1987). The First Circuit reasoned that "the Triple–A franchise has no readily ascertainable market value, it cannot be easily obtained from other sources, and it is of special interest to [the appellee]." *Id.* at 224. In short, "There can be no doubt that what [the appellee] sought, a Triple–A franchise, was unique." *Id.* In another instructive case, the Massachusetts Supreme Judicial Court many years ago refused to award specific performance in a case involving an automobile whose delivery was delayed by World War II. *Poltorak v. Jackson Chevrolet Co.*, 322 Mass. 699, 79 N.E.2d 285 (1948). The court reasoned:

> The scarcity of automobiles, which went no farther than to occasion considerable delay in delivery, is not sufficient basis for a decree of specific performance in favor of one who sought the completion of a contract for the sale of an ordinary passenger vehicle, and who showed no substantial harm of a kind of character which could not be adequately compensated by an award of damages in an action at law.

*Id.* at 702, 79 N.E.2d 285. In a third helpful case, the Supreme Judicial Court did allow specific performance in a case involving doors custom-made for an elevator. *Dahlstrom Metallic Door Co. v. Evatt Constr. Co.*, 256 Mass. 404, 152 N.E. 715 (1926). The court reasoned:

> The materials were designed and made for use in the chamber of commerce building; they were limited in number and could not readily be used in any

other building; they could not have been purchased in the open market. To have had them manufactured elsewhere would have caused serious delay in the construction of the building to the great damage of the contractor as well as of the owners. The contractor would not have an adequate remedy at law.

*Id.* at 414–15, 152 N.E. 715. Although *Poltorak* and *Dahlstrom* predate the UCC, they are significant because the Massachusetts comment to UCC section 2–716 states that the two cases are consistent with the UCC's vision of when specific performance should be allowed. Mass. Gen. Laws ch. 106 § 2–716, cmt.

■ Turning to the facts of this case, i.LAN makes three arguments why NextPoint's software is unique. First, i.LAN argues that the software is copyrighted and took years to design. The same could be said of any mass-produced item, however, and certainly a mass-produced item is the antithesis of the word "unique." More importantly, NextPoint's software is one of several competing software packages in the market; all run on ordinary computers and perform substantially the same functions. Although these software packages may be copyrighted and the product of intense labor, they are interchangeable as a practical matter and thus none is unique. Second, i.LAN argues that *it* has tailored its business around NextPoint's software, thus making the software unique to *it.* The UCC is sensitive to this consideration, but at the same time this Court will not conflate reliance with uniqueness. Much as i.LAN may not want to, it certainly *could* purchase comparable software on the open market and reconfigure its systems to run that software, just as any person could buy such software and run it. Finally, i.LAN argues that it does not know the number of software licenses it will need in the future to provide its rental

services, so money damages would not adequately compensate it. This argument is not that NextPoint's goods are unique, but that i.LAN had struck what it thought to be a unique contract: for a mere $85,231.42 it would have unlimited copies of all of NextPoint's software forever. The UCC, however, looks to the uniqueness of the goods, not the contract.

In sum, even if the clickwrap license agreement permits specific performance, and even if the Court were to enter judgment in favor of i.LAN, NextPoint's software is not unique or irreplaceable as a practical matter, so the Court would not award specific performance.

## 2. Limitation of Liability

If i.LAN's only remedy is money damages, the limitation of liability found in the clickwrap license agreement becomes very important. The Court holds that i.LAN presents nothing more than a simple breach of contract, so it is not entitled to relief under Chapter 93A, *e.g., Framingham Auto Sales, Inc. v. Workers' Credit Union,* 41 Mass.App.Ct. 416, 418, 671 N.E.2d 963 (1996), but even so, i.LAN's breach of contract claim, if proven, could result in astronomical damages. Recognizing that sellers might want to reduce their exposure to such astronomical damages, the UCC permits waivers of warranties and limitations of liability, *see* UCC § 2–316, Mass. Gen. Laws ch. 106, § 2–316 (exclusion or modification of warranties); *id.* § 2–719 (limitation of remedies), even for Chapter 93A claims, *compare Canal Elec. Co. v. Westinghouse Elec. Corp.,* 406 Mass. 369, 379, 548 N.E.2d 182 (1990) (limiting breach of warranty claim), *with VMark Software, Inc. v. EMC Corp.,* 37 Mass.App.Ct. 610, 619 n. 11, 642 N.E.2d 587 (1994) (refusing to limit misrepresentation claim). NextPoint properly has tried

to avail itself of these provisions of the UCC: the clickwrap license agreement contains a 30–day limited warranty but otherwise disclaims all warranties and limits NextPoint's liability to the fees it received for the license.[3] The key question, then, is whether the clickwrap license agreement is enforceable.

## C. Are Clickwrap License Agreements Enforceable?

The clickwrap license agreement may be analyzed as either (i) forming a contract under UCC section 2–204[4] or (ii) adding

---

3. The clickwrap license agreement provides:

IMPORTANT: NEXTPOINT IS WILLING TO LICENSE THE LICENSED PRODUCT TO LICENSEE ONLY ON THE CONDITION THAT LICENSEE ACCEPTS THE TERMS AND CONDITIONS CONTAINED IN THIS AGREEMENT. BY CLICKING THE "I AGREE" BUTTON, LICENSEE ACKNOWLEDGES THAT IT HAS READ ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT, UNDERSTANDS THEM, AND AGREES TO BE BOUND BY THEM.

IF LICENSEE DOES NOT AGREE TO THESE TERMS AND CONDITIONS, IT MUST PROMPTLY CEASE USE OF THE LICENSED PRODUCT AND RETURN THE LICENSED PRODUCT AND ALL ACCOMPANYING ITEMS TO NEXTPOINT OR ITS RESELLER FOR A FULL REFUND OF THE LICENSE FEE WHICH LICENSEE PAID FOR THE LICENSED PRODUCT.

3. LIMITED WARRANTY.

Limited Warranty. NEXTPOINT warrants to Licensee that the Licensed Products will substantially conform to the specifications set forth in the documentation provided by NEXTPOINT with the Licensed Product ("Documentation") for a period of thirty (30) days from the date when NEXTPOINT provides the License Key to the Licensee.

Warranty Service. NEXTPOINT's sole obligation with respect to claims of nonconformance with the above warranties during the applicable warranty period shall be, at NEXTPOINT's election either (a) to repair or by [sic] replace the nonconforming Licensed Product, or (b) to return the price paid for this license, resulting in termination of this Agreement.

4. LIMITATIONS OF LIABILITY

EXCEPT AS STATED IN SECTION 3 ABOVE, NEXTPOINT DISCLAIMS ALL WARRANTIES AND CONDITIONS, EITHER EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE LICENSED PRODUCT, INCLUDING ALL IMPLIED WARRANTIES AND CONDITIONS, STATUTORY OR OTHERWISE, OF MERCHANTABILITY, NONINFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE, OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE.

NEXTPOINT'S LIABILITY FOR DAMAGES TO LICENSEE FOR ANY CAUSE WHATSOEVER, REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION, SHALL BE LIMITED TO THE LICENSE FEES PAID FOR THE LICENSED PRODUCT.

NEXTPOINT SHALL NOT BE LIABLE HEREUNDER FOR ANY DAMAGES RESULTING FROM LOSS OF DATA, PROFITS OR USE OF EQUIPMENT, OR FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE USE OR PERFORMANCE OF THE LICENSED PRODUCT, WHETHER OR NOT NEXTPOINT HAS BEEN MADE AWARE OF THE POSSIBILITY OF SUCH DAMAGES.

Def.'s App. tab 8.

4. The Code provides:

§ 2–204. Formation in General.

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

UCC § 2–204, Mass. Gen. Laws ch. 106, § 2–204.

terms to an existing contract under UCC section 2–207,[5] a method of contracting that often results in a "battle of the forms," *e.g., Commerce & Indus. Ins. Co. v. Bayer Corp.,* 433 Mass. 388, 391–96, 742 N.E.2d 567 (2001). The distinction is important.

If the proper analysis is pursuant to UCC section 2–204, the analysis is simple: i.LAN manifested assent to the clickwrap license agreement when it clicked on the box stating "I agree," so the agreement is enforceable. *See Specht v. Netscape Communications Corp.,* 150 F.Supp.2d 585, 591–96 (S.D.N.Y.2001).

If the proper analysis is pursuant to UCC section 2–207, the analysis is more complicated. *See generally* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 1.3 (4th ed. 1995 & Supp.2001). UCC section 2–207 creates two forks in the road for the facts of this case. The first fork is whether or not the clickwrap license agreement is a counteroffer—an acceptance to i.LAN's purchase order "expressly made conditional on assent to the additional or different terms," UCC § 2–207(1), here the additional terms limiting NextPoint's potential liability. The second fork is whether i.LAN accepted the additional terms either explicitly,

implicitly, or by default. Clicking on "I agree" could be seen as *explicit* acceptance. Between merchants, if a party never objects to the additional terms, and the additional terms are not "material," then the UCC deems the party to have accepted the additional terms *implicitly,* for lack of a better description. UCC § 2–207(2); *see JOM, Inc. v. Adell Plastics, Inc.,* 193 F.3d 47, 52–59 (1st Cir.1999) (en banc). The comment to UCC section 2–207 suggests that the test for "materiality" is whether the terms in question would result in unreasonable surprise or hardship to the party if incorporated without the party's express awareness. UCC § 2–207 cmt. 4. Finally, if the additional terms are not accepted either explicitly or implicitly, but the conduct of the parties shows recognition of a contract, then the gap-filler provisions of Article 2 kick in to fill the void with *default* terms. UCC § 2–207(3); *Ionics, Inc. v. Elmwood Sensors, Inc.,* 110 F.3d 184, 188–89 (1st Cir.1997) (overruling *Roto–Lith, Ltd. v.. F.P. Bartlett & Co.,* 297 F.2d 497 (1st Cir.1962), which held that a response stating a condition materially altering the obligation solely to the disadvantage of the offeror was an acceptance expressly conditioned on assent to the ad-

---

**5.** The Code provides:
§ 2–207. Additional Terms in Acceptance or Confirmation.
(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
(a) the offer expressly limits acceptance to the terms of the offer;
(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.
UCC § 2–207; *accord* Mass. Gen. Laws ch. 106, § 2–207 ("additional or different terms").

ditional terms, which became binding unless specifically rejected).

With respect to the first fork, the clickwrap license agreement is best characterized as a counteroffer, as its language mirrors the language provided after the comma in UCC section 2–207(1): "NEXT-POINT IS WILLING TO LICENSE THE LICENSED PRODUCT TO LICENSEE ONLY ON THE CONDITION THAT LICENSEE ACCEPTS THE TERMS AND CONDITIONS CONTAINED IN THIS AGREEMENT." Def.'s App. tab 8. The first fork only has importance, however, if the parties disagree over the additional terms. In this case, i.LAN's purchase order was silent on the issue of liability, so NextPoint proposed additional terms which, to be extra cautious, NextPoint characterized as a counteroffer. In such a case, if the original offer is silent on the issue of the additional terms, and no objection ever is made to them, then it should not matter whether the additional terms are part of a counteroffer or a proposal. All that should matter in this case, then, is whether i.LAN accepted the additional terms. Article 2 does not limit liability by default, so if i.LAN accepted the clickwrap license agreement it must have done so either explicitly, by clicking on "I agree," or implicitly, as provided in UCC section 2–207(2).

The case to which i.LAN pins its hopes is *Step–Saver Data Systems, Inc. v. Wyse Technology,* 939 F.2d 91 (3d Cir.1991). *Step–Saver* considered *shrinkwrap* license agreements, where the agreement is printed somewhere on or in the box of software, rather than *clickwrap* license agreements, where the agreement appears on the computer before the software is installed, but otherwise the facts of *Step–Saver* are similar to the facts before this Court: (i) a reseller telephoned a software manufacturer and asked for a shipment of software, which the manufacturer verbally agreed to provide, (ii) the reseller then sent a written purchase order specifying quantity, price, and shipping and payment information, and (iii) the manufacturer then shipped the software along with an invoice matching the purchase order. On the box containing the software, however, was a shrinkwrap license agreement which contained a provision limiting the manufacturer's liability to the price paid for the shipment. The question for the court was whether to enforce the provision of the shrinkwrap license agreement limiting the manufacturer's liability. The court held that the limitation of liability was not enforceable because it was merely a proposed agreement under UCC section 2–207 to which the reseller never agreed; the court refused to imply assent because the limitation of liability was material and UCC section 2–207(2)(b) does not allow *material* terms to be added by implication. *Id.* at 105. This holding was fully adopted in a later case against the same software manufacturer, *Arizona Retail Systems, Inc. v. The Software Link, Inc.,* 831 F.Supp. 759, 766 (D.Ariz.1993).

*Step–Saver* once was the leading case on shrinkwrap agreements. Today that distinction goes to a case favoring NextPoint, *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447 (7th Cir.1996). The holding of *ProCD* is best summarized as follows: "terms inside a box of software bind consumers who use the software after an opportunity to read the terms and to reject them by returning the product." *Hill v. Gateway 2000, Inc.,* 105 F.3d 1147, 1148 (7th Cir.1997). *ProCD* did not apply UCC section 2–207: "Our case has only one form; UCC § 2–207 is irrelevant." 86 F.3d at 1452. Instead, *ProCD* applied only UCC section 2–204 and concluded that the absence of a timely rejection was sufficient to show assent.

The analytical difference between *Step–Saver* and *ProCD* is whether "money now, terms later" forms a contract (i) at the time of the purchase order or (ii) when the purchaser receives the box of software, sees the license agreement, and does not return the software. *See, e.g., Klocek v. Gateway, Inc.,* 104 F.Supp.2d 1332, 1338–39 (D.Kan.2000) (noting distinction and rejecting *ProCD* ); *M.A. Mortenson Co. v. Timberline Software Corp.,* 140 Wash.2d 568, 998 P.2d 305, 312–14 (2000) (en banc) (noting distinction and embracing *ProCD* ). If the purchase order is the contract, UCC section 2–207 applies and material terms cannot be added to the contract without explicit assent. If the contract is not formed until after the purchaser sees the shrinkwrap license agreement, UCC section 2–204 applies and the act of keeping the software implicitly shows assent.

■ The Court will enforce NextPoint's clickwrap license agreement for two reasons. First and foremost, the Court agrees with those cases embracing the theory of *ProCD*. *E.g., 1–A Equipment Co. v. ICode, Inc.,* No. 0057CV467, 2000 WL 33281687 (Mass.Dist. Nov.17, 2000) (Winslow, J.). The UCC "shall be liberally construed and applied to promote its underlying purposes and policies," which include "the continued expansion of commercial practices through custom, usage and agreement of the parties." UCC § 1–102, Mass. Gen. Laws ch. 106, § 1–102. "Money now, terms later" is a practical way to form contracts, especially with purchasers of software. If *ProCD* was correct to enforce a shrinkwrap license agreement, where any assent is implicit, then it must also be correct to enforce a clickwrap license agreement, where the assent is explicit. To be sure, shrinkwrap and clickwrap license agreements share the defect of any standardized contract—they are susceptible to the inclusion of terms that border on the unconscionable—but that is not the issue in this case. The only issue before the Court is whether clickwrap license agreements are an appropriate way to form contracts, and the Court holds they are. In short, i.LAN explicitly accepted the clickwrap license agreement when it clicked on the box stating "I agree."

■ Second, even if the Court were to agree with i.LAN that UCC section 2–207 governs, the Court would hold that i.LAN implicitly accepted the clickwrap license agreement because its additional terms were not material, UCC § 2–207(2)(b). In other words, there can be no unreasonable surprise or hardship to i.LAN from enforcing the limitation of liability. To understand this holding requires a bit of background. When NextPoint and i.LAN first formed their relationship, i.LAN signed the 1998 VAR agreement, which contains warranty disclaimers and limitations of liability nearly identical to those found in the clickwrap license agreement.[6]

---

6. The 1998 VAR agreement provides:

*12. LIMITATIONS OF LIABILITY*

12.1. NEXTPOINT MAKES NO WARRANTIES AND CONDITIONS TO VAR [i.e., i.LAN], EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE LICENSED PRODUCTS, AND DISCLAIMS ALL WARRANTIES INCLUDING ALL IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE.

12.2. NEXTPOINT'S LIABILITY FOR DAMAGES TO VAR FOR ANY CAUSE WHATSOEVER, REGARDLESS OF THE FORM OF ANY CLAIM OR ACTION, SHALL NOT EXCEED THE TOTAL MONIES PAID UNDER THIS AGREEMENT DURING THE 12–MONTH PERIOD IMMEDIATELY PRECEDING SUCH CLAIM.

12.3. NextPoint's only liability to End Users shall be as set forth in the End User

Furthermore, the 1998 VAR agreement incorporates the clickwrap license agreement by reference and specifically states that NextPoint's liability to end users of the software will be limited by the clickwrap license agreement. Finally, i.LAN had installed the software on many occasions before the transaction in 1999, and each time i.LAN necessarily ran across the clickwrap license agreement. In short, NextPoint consistently included a warranty disclaimer and limitation of liability in every contract it made.

Every contract, that is, except the 1999 purchase order. That contract contains a price, a quantity, and five specific terms, but is silent with respect to warranties and potential liability. Thus, i.LAN argues that NextPoint's "contrived attempt to supersede the [1999 purchase order] with directly contradicting terms or a standardized click license, a license that was neither referenced in the [1999 purchase order] nor even mentioned during negotiations, is absurd." Pl.'s Opp'n at 1. To the contrary, it would be absurd to allow silence to destroy the detailed private ordering created by the 1998 VAR and clickwrap license agreements. Indeed, the clickwrap license agreement specifically was intended to fill any gaps left by the 1999 purchase order. *See supra* p. 5. "There is a long tradition in contract law of reading contracts sensibly; contracts—certainly business contracts of the kind involved here—are not parlor games but the means of getting the world's work done." *R.I. Charities Trust v. Engelhard Corp.*, 267 F.3d 3, 7 (1st Cir.2001). The only sensible interpretation of the 1999

purchase order is that it did not affect the limitations of liability found in the parties' prior and subsequent agreements.

## III. CONCLUSION

For the reasons set forth above, NextPoint's cross-motion for partial summary judgment [Docket No. 51] was ALLOWED on September 28, 2001 with respect to i.LAN's claims for specific performance (Count I) and violation of Chapter 93A (Count VII). Furthermore, the Court held that if i.LAN were to prevail on any of its other claims, it would be entitled to recover no more than the amount it paid for the software license at issue, to wit, $85,231.42.

License Agreement or Support Subscription Agreement between NextPoint and End User.

12.4. Neither party shall be liable hereunder for any damages resulting from loss of data, profits or use of equipment, or for any special, incidental, exemplary, punitive, or consequential damages arising out of or in connection with the use or performance of the Licensed Products, whether or not such party has been made aware of the possibility of such damages.

Def.'s App. tab 1.