400 F.3d 130
 ARBITRON, INC., Plaintiff-Appellant,
v.
TRALYN BROADCASTING, INC., Defendant,
JMD, INC., doing business as WLNF-FM, doing business as WROA-AM, doing business as WZKX-FM, doing business as WGCM-AM-FM, Defendant-Appellee.
 Docket No. 03-9276(L).
 Docket No. 04-0264-cv(CON).
 United States Court of Appeals, Second Circuit.
 Argued: September 7, 2004.
 Decided: March 4, 2005.
 
 Alfred R. Fabricant, Ostrolenk, Faber, Gerb & Soffen, LLP, New York, NY, for Plaintiff-Appellant.
 Lawrence J. Bernard, Jr., Washington, D.C., for Defendant-Appellee.
 Before: McLAUGHLIN, CALABRESI, and HALL, Circuit Judges.
 CALABRESI, Circuit Judge.
 
 
 1
 This breach of contract dispute raises the question of whether, under New York law, two parties entering into a licensing agreement for radio ratings and data may authorize one party to adjust the price of that data unilaterally at some point in the future. Several issues of New York contract law are peripherally implicated in this case, and some of them are sufficiently important and unsettled that, under different circumstances, they might warrant certification to the New York Court of Appeals for resolution. But ultimately, we conclude that the contract before us delegated, with unmistakable clarity, price-setting authority to a single party, and that New York law does not invalidate such contracts. We therefore vacate the district court's order of summary judgment and remand for reconsideration.
 
 I. BACKGROUND
 
 2
 Plaintiff-appellant Arbitron, Inc. ("Arbitron"), a Delaware corporation [A9], is a popular listener-demographics data provider for North American radio stations. Arbitron licenses its copyrighted listener data to regional AM and FM stations, which then use the demographic profiles of station listeners to attract advertisers. In 1997, Arbitron entered into one such license — a "Station License Agreement to Receive and Use Arbitron Radio Listening Estimates" (the "License Agreement")with defendant Tralyn Broadcasting, Inc. ("Tralyn"), a Mississippi corporation [A9]. The License Agreement permitted Tralyn's only radio station (WLUN-FM in the Gulfport, Mississippi area, later known as WLNF-FM) to use Arbitron listening data reports. Over its five-year term, the License Agreement charged Tralyn a monthly rate of $1,729.57 for the use of Arbitron's listening data reports by this single station.
 
 
 3
 Were this monthly license fee the only pricing portion of the License Agreement, this case would present an extremely simple contract dispute. But another clause of the agreement — which we shall call the "escalation clause" — provided that, were Tralyn or its successor to acquire additional radio stations in the same or adjacent regional markets, a new license fee would be charged. Upon acquiring such stations, Tralyn was required to notify Arbitron so that Arbitron could determine a new license fee, and, if necessary, approve the assignment of the licensing agreement to a new party in interest. Any new licensing fee would be set, according to the escalation clause, at Arbitron's discretion. The clause provided:
 
 
 4
 In the event that Arbitron consents to the assignment of this Agreement, Arbitron reserves the right to redetermine the rate to be charged to the assignee.... Station agrees that... if it is or was purchased or controlled by an entity owning or otherwise controlling other radio stations in this Market or an adjacent Market ... Station ... will report the change and the effective date thereof to Arbitron within 30 days of such change. In the event of such occurrence, Station further agrees that Arbitron may redetermine its Gross Annual Rate for the Data, Reports and Services licensed hereunder, as well as any Supplementary Services, effective the first month following the date of the occurrence. Notwithstanding Station's failure to notify Arbitron, pursuant to provisions of this paragraph, Arbitron may redetermine the Station's Gross Annual Rate for all Data, Reports and Services, as well as any Supplementary Services, based on the foregoing, effective the first month following the date of the occurrence.
 
 
 5
 Pursuant to this "escalation clause," Arbitron was given the right to increase the license fee as Tralyn purchased additional stations (or as entities owning additional stations purchased Tralyn). Thus, the escalation clause assumed that, as Tralyn acquired additional regional stations, it would share listener data among each of these stations, and, by allowing Arbitron to increase Tralyn's fees, the clause provided Arbitron with a mechanism to reflect this additional use.
 
 
 6
 On October 31, 1999, Tralyn was purchased by defendant-appellant JMD, Inc. ("JMD") a Mississippi corporation. At the time JMD acquired Tralyn and WLNF-FM, JMD also controlled at least four other stations in the Gulfport, Mississippi market (WROA-AM, WZKX-FM, WGCM-AM, and WGCM-FM). The purchase agreement between JMD and Tralyn assigned to JMD the License Agreement; JMD thereby assumed responsibility for paying Arbitron, and implicitly, for notifying Arbitron of the additional radio stations now operated by Tralyn's successor. But in violation of Paragraph 11 of the License Agreement, neither JMD nor Tralyn obtained Arbitron's prior written consent to the License Agreement's assignment. Nor did they provide Arbitron with notice of a change in ownership of WLNF-FM. Instead, from November 1999 until June 2002, JMD simply paid the original single-station monthly license fee ($1,729.57) directly to Arbitron. In return, Arbitron provided WLNF-FM with updated listening data (specifically, the Fall 1999 Ratings Book and Research Data — referred to by the parties as the "Fall Book" — which was published in February 2000).
 
 
 7
 In June 2000, Arbitron discovered, through its own diligence, that JMD had purchased Tralyn and that the terms of the License Agreement had been breached. Arbitron thereupon notified JMD by letter that it was exercising its right to increase the monthly licensing fee under the escalation clause of the License Agreement. Arbitron determined JMD's new annual license fee by multiplying the single-station license fee ($1,779.57) by five ($8,897.85) to reflect the five JMD stations that could now share Arbitron's listener data. It then reduced that figure by 35% to reflect the typical volume discount for licenses covering five or more stations. The result was a revised monthly charge of $5,784.93. Based on this new licensing fee, which Arbitron claimed should have been paid since the October 1999 purchase, Arbitron sent JMD an invoice for "incomplete" payments made between October 1999 and June 2000. It also sent an invoice indicating the additional payments that would be due for the next quarter's listening reports.
 
 
 8
 JMD never paid these invoices, and subsequently refused to pay anything — even the $1,779.57 due each month under the original one-station License Agreement. Arbitron therefore stopped sending JMD its listening data reports, as it was permitted to do under the License Agreement upon the licensee's nonpayment of the monthly licensing fee.
 
 
 9
 Arbitron filed the instant suit against Tralyn and JMD on November 1, 2001. Its complaint for breach of contract sought $172,394.22, representing all moneys due under the Licensing Agreement (plus interest) from June 1999 to the end of the contract's five-year term. After a series of discovery squabbles, Arbitron moved to compel JMD to respond to document requests and interrogatories. JMD responded by arguing that all necessary discovery had been completed, and that summary judgment in its favor (as well as monetary judgment against Arbitron for its decision to cease delivery of its listening reports after JMD refused to pay the increased monthly licensing fee) was now appropriate.
 
 
 10
 On June 5, 2003, the district court (Sweet, J.) denied Arbitron's motion to compel further discovery, and granted summary judgment — but not monetary damages — to JMD. See Arbitron, Inc. v. Tralyn Broad., Inc., 269 F.Supp.2d 264 (S.D.N.Y.2003). The district court concluded that because "[n]either the escalation clause in ¶ 11, nor any other section of the Agreement, contains any basis for determining the new rate to be paid Arbitron in the event changes in ownership occur," the License Agreement's escalation clause was unenforceably vague under New York law. See id. at 266-67. The district court reasoned that
 
 
 11
 [c]ourts have refused to enforce similarly uncertain agreements. For instance, where a permit failed to specify the amount of rent reduction in the event the landlord exercised an option to reclaim a portion of the premises, and the court held that there "was not a sufficiently definite offer which could give rise to an enforceable agreement." In Matter of Exp.Indus. and Terminal Corp., 93 N.Y.2d 584, 591, 693 N.Y.S.2d 857, 715 N.E.2d 1050 (1999)..... Likewise, in Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, the court struck a renewal clause in a lease providing for future agreement on rent as overly vague. 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981). It would have "sufficed" for the "methodology for determining the rent ... to be found within the four corners of the lease," but there must be some "objective, extrinsic event, condition or standard on which the amount was to depend." Id. at 110, 436 N.Y.S.2d 247, 417 N.E.2d 541.
 
 
 12
 269 F.Supp.2d at 267 (footnote omitted). In concluding that the escalation clause (but not the rest of the License Agreement) was void for vagueness, the district court emphasized the following passage from Delicatessen:
 
 
 13
 [B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves. Thus, definitiveness as to material matters is of the very essence of contract law. Impenetrable vagueness and uncertainty will not do.
 
 
 14
 Id. (quoting Delicatessen, 52 N.Y.2d at 109, 436 N.Y.S.2d 247, 417 N.E.2d 541). Because the district court considered the escalation clause to be "impenetrabl[y] vague[ ]" for want of a missing term, it deemed that portion of the License Agreement unenforceable under New York law, and therefore awarded summary judgment to JMD. Arbitron now challenges the district court's decision.
 
 II. DISCUSSION
 
 15
 We review de novo a district court's grant of summary judgment. See Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir.2003). In so doing, we "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Id. The relevant facts here are not disputed by either party; only the correct interpretation of New York law is at issue. And we review de novo the district court's interpretation of state law. See Carney v. Philippone, 332 F.3d 163, 167 (2d Cir.2003).
 
 
 16
 The district court based its decision on three New York cases, each dealing with contracts for the sale or lease of real property. Upon review of these same cases, we conclude that the escalation clause is enforceable under the common law of New York. This is so because the clause before us is not an "agreement to agree," under which future negations between the parties must occur, but is instead an acknowledgment that, if certain conditions arise in the future, no new agreement is required before Arbitron may set new license terms. Such an agreement is not unenforceably vague under New York's common law.
 
 
 17
 The seminal New York precedent on unenforceably indefinite contracts is Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981). There, the Court of Appeals was faced with an agreement between a landlord and a tenant to lease a commercial space for five years at a monthly rate beginning at $500 and escalating over five years to $650, with the option to renew the lease for another five-year term at a rent to be determined by the parties. At the close of the lease's five-year term, the landlord sought to increase the rent from $650 to $900 monthly. Surprised, the tenant employed an assessor, who appraised the market value of the premises at no more than $550 per month. The tenant sued for specific performance, seeking a new five-year lease at the fair market rate of $550. Id. at 108, 436 N.Y.S.2d 247, 417 N.E.2d 541. In resolving the case, the Delicatessen majority recognized that the U.C.C., as implemented by the New York legislature, counseled in favor of supplying missing price terms to save and enforce the agreement, and that the terms supplied by a court under the U.C.C. would correspond to a good's fair market value. Id. at 111, 436 N.Y.S.2d 247, 417 N.E.2d 541 (discussing predecessors to N.Y. U.C.C. § 2-305 in New York law). Nevertheless, because the New York statute's terms made clear that leases or contracts for the sale of real property were not covered by the U.C.C., the Court of Appeals refused to enforce the agreement. It concluded that
 
 
 18
 it is rightfully well settled in the common law of contracts in this State that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable. This is especially true of the amount to be paid for the sale or lease of real property. The rule applies all the more, and not the less, when, as here, the extraordinary remedy of specific performance is sought.
 
 
 19
 52 N.Y.2d at 109-10, 436 N.Y.S.2d 247, 417 N.E.2d 541 (all emphases added) (internal citations omitted).
 
 
 20
 In a separate opinion, Judge Meyer concurred in the judgment and opined that the U.C.C.'s principles might now be part of the common-law fabric of New York commercial law. See id. at 112, 436 N.Y.S.2d 247, 417 N.E.2d 541 (Meyer, J., concurring) ("That the setting of [a prior case permitting courts to supply missing terms] was commercial and that its principle is now incorporated in a statute (the Uniform Commercial Code) which by its terms is not applicable to real estate is irrelevant to the question whether the principle can be applied in real estate cases.... To the extent that the majority opinion can be read as holding that no course of dealing between the parties to a lease could make a clause providing for renewal at a rental `to be agreed upon' enforceable I do not concur."). And for similar reasons, Judge Jasen dissented altogether. See id. (Jasen, J., dissenting) ("While I recognize that the traditional rule is that a provision for renewal of a lease must be `certain' in order to render it binding and enforceable, in my view the better rule would be that if the tenant can establish its entitlement to renewal under the lease, the mere presence of a provision calling for renewal at `rentals to be agreed upon' should not prevent judicial intervention to fix rent at a reasonable rate in order to avoid a forfeiture.").[1]
 
 
 21
 In Cobble Hill Nursing Home v. Henry & Warren Corp., 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989), the Court of Appeals again faced the question of unspecified price terms. The contract in Cobble Hill gave the plaintiff a purchase option for a nursing home, but did not provide a specific price for the property. The agreement instead permitted plaintiff to buy the property "at a price determined by the Department [of Health] in accordance with the Public Health Law and all applicable rules and regulations of the Department." Id. at 480, 548 N.Y.S.2d 920, 548 N.E.2d 203 (internal quotes omitted). When the plaintiff exercised that option and attempted to buy the nursing home at the price set by the Department of Health, defendants refused to honor the option, citing a perceived discrepancy between the property's fair market value and the Department of Health's assessment. Id. at 401, 548 N.Y.S.2d 920, 548 N.E.2d 203. Plaintiff filed suit for breach of contract, seeking specific performance at the price set by the Department. Id. Defendants claimed that the agreement was unenforceably vague because its four corners did not include a definite price term. Id. Evaluating these arguments, the Court of Appeals emphasized that "[f]ew principles are better settled in the law of contracts than the requirement of definiteness," and that under New York law "[i]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." Id. at 482, 548 N.Y.S.2d 920, 548 N.E.2d 203 (citing Delicatessen, 52 N.Y.2d at 109, 436 N.Y.S.2d 247, 417 N.E.2d 541). But it also noted that
 
 
 22
 a price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula. Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage. A price so arrived at would have been the end product of agreement between the parties themselves.
 
 
 23
 Id. at 483, 436 N.Y.S.2d 247, 417 N.E.2d 541 (internal quotes and citations omitted). Applying that reasoning to the option contract, the Court concluded that, because it was "apparent from the agreement that these parties reposed discretion in the Department to make the price determination, limited only by the requirement that it apply provisions that were suitable, pertinent and appropriate for the task at hand," id. at 484, 436 N.Y.S.2d 247, 417 N.E.2d 541, and because "[t]he terms of agreement and the appropriate remedy can be readily determined, and it is plain that the parties intended this to be a complete and binding contract," id. at 485, 436 N.Y.S.2d 247, 417 N.E.2d 541, there was "no legal justification for voiding this agreement." Id.
 
 
 24
 Most recently, in In Re Express Indus. & Terminal Corp., 93 N.Y.2d 584, 693 N.Y.S.2d 857, 715 N.E.2d 1050 (1999), the Court of Appeals refused to enforce a lease agreement whose material terms, including the price term, were simply left blank by the parties. A unanimous Court concluded that because the lease agreement's terms — including the date on which an option would expire, and the amount of rent reduction that would correspond to the exercise of that option — were represented by blank spaces, and because there was "no objective evidence that the parties [to the lease agreement] intended that [the lessor] be allowed to fill in these blanks with any reasonable terms [it] chose," id. at 590, 693 N.Y.S.2d 857, 715 N.E.2d 1050, the contract was not enforceable under New York law. But the Court also suggested that, in the face of sufficient evidence demonstrating that both parties intended to give one party the power to select "any reasonable terms [it] chose," a similar contract for the sale or lease of real property might be enforceable. See id. (noting that "there are some instances where a party may agree to be bound to a contract even where a material term is left open," but that "there must be sufficient evidence that both parties intended that arrangement").
 
 
 25
 Upon review of Delicatessen, Cobble Hill, and Express Industries, we conclude that the License Agreement's escalation clause is indeed enforceable under the common law of New York. The escalation clause, unlike the promise to set a future rent rate collectively in Delicatessen, does not require the parties to reach an "agreement" on price at some point in the future. That is, the escalation clause is not an "agreement to agree." Delicatessen, 52 N.Y.2d at 109, 436 N.Y.S.2d 247, 417 N.E.2d 541. Instead, like the contract in Cobble Hill, it is a mechanism for objectively setting material terms in the future without further negotiations between both parties. It does so, moreover, with "sufficient evidence that both parties intended that [pricing] arrangement." Express Indus., 93 N.Y.2d at 590, 693 N.Y.S.2d 857, 715 N.E.2d 1050. The escalation clause clearly and unambiguously states that, in the event that Tralyn or its successors acquired new radio stations in the same (or an adjacent) geographic market, "Arbitron may redetermine its Gross Annual Rate for the Data, Reports and Services licensed hereunder ... effective the first of the month following [the acquisition]." The escalation clause further provides, in unambiguous language, that Arbitron may exercise this power to "redetermine" the license fee "[n]otwithstanding Station's failure to notify Arbitron" that an acquisition had occurred.
 
 
 26
 The intent of the parties is manifest in the language of the agreement. Both Arbitron and Tralyn explicitly agreed that Arbitron was authorized to adjust the license fee in the event that Tralyn or its successors began to operate additional stations. This fact makes the instant case very different from those disputes in which courts are faced with "no objective evidence" of a shared intent to permit one party to set prices in the future. See Express Industries, 93 N.Y.2d at 590, 693 N.Y.S.2d 857, 715 N.E.2d 1050. And it in no way leads a court enforcing the contract to "impos[e] its own conception of what the parties should or might have undertaken." Delicatessen, 52 N.Y.2d at 109, 436 N.Y.S.2d 247, 417 N.E.2d 541. Accordingly, we conclude that the district court erred in holding the License Agreement's escalation clause "impenetrably vague" under New York law.
 
 
 27
 In reaching this conclusion, we note that the cases discussed above are not the only New York precedents on the issue of missing contract terms. Under New York's implementation of the Uniform Commercial Code, there is a strong presumption that agreements are enforceable even if their price terms are not definite. N.Y. U.C.C. § 2-305 provides that:
 
 
 28
 (1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if (a) nothing is said as to price; or (b) the price is left to be agreed by the parties and they fail to agree; or (c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.
 
 
 29
 (2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.
 
 
 30
 Id. (emphases added). The commentary to this section of New York's commercial code makes clear that "[t]his Article rejects in these instances the formula that `an agreement to agree is unenforceable' ... and rejects also defeating such agreements on the ground of `indefiniteness.' Instead this Article recognizes the dominant intention of the parties to have the deal continue to be binding upon both." N.Y. U.C.C. § 2-305, Purposes of Changes, cmt. 1 (emphasis added). See also N.Y. U.C.C. § 2-204(3) ("Even though one or more terms are left open a contract for sale [of goods] does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.").
 
 
 31
 It is not clear whether, under New York law, a license agreement of the sort at issue in this case constitutes a contract for the sale of goods, or is otherwise governed by the U.C.C.[2] We note, however, that were this section of New York's commercial code applied to the License Agreement, then the escalation clause would undoubtedly be a valid contract term under New York law; it would simply establish "[a] price to be fixed by the seller," and would be enforceable so long as that price was fixed "in good faith." N.Y. U.C.C. § 2-305. But the applicability of the U.C.C. to the license agreement before is not something we need to decide today.
 
 
 32
 Because we believe that the License Agreement's escalation clause is not inconsistent with New York law, we conclude that the district court erred in granting summary judgment to JMD. We therefore vacate the district court's order and remand the case for further proceedings.[3] On remand, the district court may wish to consider whether Arbitron has exercised its authority under the escalation clause in "good faith" within the meaning of N.Y. U.C.C. § 2-305 (which, as we have previously noted, may or may not apply to a "license" of this sort), or more generally, in a manner consistent with Arbitron's implied duty of fair dealing under New York law. See, e.g., Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 230 (2d Cir.1991) ("Under New York law, every contract contains an implied covenant of good faith and fair dealing."). We express no opinion on either question.
 
 III. CONCLUSION
 
 33
 The License Agreement, including its escalation clause, is not unenforceably vague under New York law. The judgment of the district court is therefore VACATED, and the case is REMANDED for proceedings not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 We note that, despite its "seminal" status,Delicatessen is of limited precedential value in this case. The majority opinion emphasized that its conclusion was "especially true" in relation to the subject matter at hand (real property), and "all the more, and not the less" true for the requested remedy (specific performance). See 52 N.Y.2d at 109-10, 436 N.Y.S.2d 247, 417 N.E.2d 541. Those qualifications undermine Delicatessen's applicability in contractual disputes related to the subject matter ("licenses" for listener data reports), and the requested remedy (monetary damages), before us.
 
 
 [2]
 This ambiguity is not unique to New York. In many states, it is not clear whether "license" agreements — be they for the right to use software, or data such as Arbitron's, or other types of property — are contracts for the sale of "goods" and therefore within the U.C.C.'s purviewSee, e.g., Specht v. Netscape Communications Corp., 306 F.3d 17, 29 n. 13 (2d Cir.2002) ("It is not obvious, however, that U.C.C. Article 2 (`sales of goods') applies to the licensing of software," since such licenses may provide the right to use intangible "downloaded" programs); ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1450 (7th Cir.1996) ("[W]e treat [ ] licenses as ordinary contracts accompanying the sale of products, and therefore as governed by the common law of contracts and the Uniform Commercial Code."); I.Lan Sys., Inc. v. Netscout Serv. Level Corp., 183 F.Supp.2d 328, 332 (D.Mass.2002) (noting that "[i]n Massachusetts and across most of the nation, software licenses exist in a legislative void," and concluding that "Article 2 [of the U.C.C.] technically does not ... govern software licenses, but for the time being, the Court will assume that it does"); Architectronics, Inc. v. Control Sys., Inc., 935 F.Supp. 425, 431-32 (S.D.N.Y.1996) (noting, in the context of a software license agreement, that Article 2 of New York's implementation of the U.C.C. "is not to be confined merely to those transactions in which there is a transfer of title," and that Article 2 may be applicable to some license agreements "if the license provides for transfer of some of the incidents of goods ownership") (internal citation omitted).
 Though courts have typically pondered the problem of "license" agreements in the software context, the same problem presents itself when analyzing a "license" for the use of Arbitron's listener data reports. Such a "license" could be understood, on the one hand, as an agreement for the sale of the physical embodiment of the data (i.e., the sale of the book in which the data is printed), or on the other hand, as a contract for data reporting services (i.e., the temporary grant of a right to read, but not own, the book containing copyrighted material). This is, in many ways, the same difficulty animating the software cases — are "license" agreements for software programs covenants covering the sale of the physical embodiment of the program (for example, in CD-ROM format), or are they instead contracts for programming services?
 
 
 [3]
 Because we hold that the district court erred in concluding that the License Agreement's escalation clause was unenforceable under New York law, we need not consider Arbitron's argument that, prior to declaring the escalation clause invalid, the district court should have examined extrinsic evidence as to the meaning of the License Agreement