ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| CiyaSoft Corporation | ) ASBCA Nos. 59519, 59913 |
| | ) |
| Under Contract No. W91B4L-10-P-1475 | ) |

APPEARANCE FOR THE APPELLANT:     Ms. Laila H. Rashed
                                  Corporate Officer and Director of Sales

APPEARANCES FOR THE GOVERNMENT:   Raymond M. Saunders, Esq.
                                   Army Chief Trial Attorney
                                  Evan C. Williams, Esq.
                                  CPT William T. Wicks, JA
                                  Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE MCNULTY

Appellant, CiyaSoft Corporation (hereafter appellant or CiyaSoft), licensed 20 copies of commercially available translation software it had developed to the government via a Federal Acquisition Regulation (FAR) Part 12 commercial items contract. The contract included a single user licensing agreement, the specific, detailed terms of which were unknown to the government before the software was delivered. Appellant asserts the government has breached the contract, violating the licensing agreement by installing the same copy of the software on more than one government computer system, by permitting the software to be passed on to non-government personnel and copied thousands of times and by failing to secure and protect the software as required by the terms of the contract.[1] We are asked to decide entitlement only. We sustain the appeals in part. The matter is remanded to the parties to negotiate quantum in accordance with this decision.

FINDINGS OF FACT

1. Appellant is a software development company with offices in California and Virginia (R4, tab 2; tr. 1/46). One of its products is machine translation software, called CiyaTran, which is capable of translating from English into Dari or Pashto and

---

[1] Initially, appellant's appeal also included a patent infringement claim. This claim was dismissed, with appellant interposing no objection, due to the Board's lack of jurisdiction over patent infringement claims. (ASBCA No. 59519, Bd. corr. order dtd. September 14, 2015). *See CANVS Corporation*, ASBCA No. 56347, 08-2 BCA ¶ 33,892.

vice versa. Appellant refers to this capability as bidirectional translation. (Tr. 1/39, 47-49, 54)

2. Appellant has been developing translation software for many years and has sold or licensed use of other versions of its translation software to the government previous to the contract under which these appeals arise (tr. 1/28-34, 42). Appellant developed the English/Dari and Pashto bidirectional machine translation software using its own funds (tr. 1/23-34, 65). The translation software is sold internationally to government agencies and corporate customers, but has not been purchased by individual members of the general public due to its high price (tr. 1/33-35, 37, 94-95; R4, tab 26 at 13).

3. In early July 2010, appellant received an unsolicited email from CPT Ginger Donohoo (tr. 1/47). CPT Donohoo, assigned to the 2nd Brigade Combat Team (BCT) of the 101st Airborne Division, expressed an interest in appellant's English/Dari bidirectional translation software and requested pricing information from appellant for both 20 single user licenses and a network license for 20-50 users (app. supp. R4, tab 12 at 2, tab 13 at 3, ¶ 1). In a follow up email CPT Donohoo indicated that the government wanted an additional price quote for 10 single user licenses and that the price, including shipping, needed to be $100,000, or less (app. supp. R4, tab 12 at 1).

4. In an email the following day, appellant appended a response, with the subject, "Single-user Bidirectional English CiyaTran MT Price Quote," to CPT Donohoo's inquiries as follows:

1. Shipping cost for the initial CD(s) to any location worldwide is included in the price.
2. Activation is by phone or the Internet.
3. Delivery of subsequent updates and upgrades (which are part of support and maintenance) is via FTP.
4. Support shall be provided via telephone and email. Phone support is from 9AM to 11:30PM PST, i.e., 8:30PM to 11AM Afghanistan time, unless prior arrangements are made.
5. On-site support is not included in this price quote and may be provided under a separate training agreement.
6. These quotes are FOB Destination and are valid for 90 days.

| Single–User, Bidirectional English/Dari CiyaTran MT, with one year Support and Maintenance | Number of Licenses | $ U.S. |
|---|---|---|
| | 1 | 8,800 |
| 45% discount | 20 | 96,800 |
| 50% discount | 50 | 220,000 |

(R4, tab 2; app. supp. R4, tab 12 at 1)

5. Shortly thereafter the contracting officer, SSgt Lesly Richardson,[2] prepared a justification to purchase on a sole source basis, "20 Ciyatran Single-user Bidirectional (English/Dari) Language Machine Translation Software with one year maintenance and support" (app. supp. R4, tab 13 at 2). The justification memorandum also states the software "will be used throughout the BDF and BN levels in order to assist in the translation of operation orders, mission planning documents, standard operating procedures, and Combined Joint Operations Center battle drills." The justification memorandum states the unit requesting the software, the 2nd Brigade Combat Team, then had only 112 of 340 interpreters requested and that the software would free up interpreters from translating documents to support ground maneuver units, but the memorandum does not provide any other indication of how the government intended to use the software. (*Id.*) The contracting officer testified that market research was performed to discover the existence of appellant's software (tr. 2/231-32).

6. The contracting officer only had approximately six months of experience as a contracting officer at the time and had never purchased software for the government prior to awarding the contract involved in this appeal (tr. 2/202-04).

7. Appellant's next contact with the government regarding its translation software came in a telephone call a few days before it was awarded the contract (tr. 1/51-52). Although appellant was not aware of it at the time, the caller was the contracting officer (tr. 1/52, 99-100, 138, 2/206, 232-33, 239). The contracting officer testified that the purpose of the call was to verify appellant was still willing to perform for the quoted price and to determine how quickly appellant could deliver (tr. 2/232-33, 239-40). The contracting officer never discussed the terms of any licensing agreement (tr. 2/240-41).

8. Appellant's representative, Mr. Hamid Daroui, accepted the call (tr. 1/52-55). Mr. Daroui testified that he was not aware that the call was related to the inquiry appellant had received from CPT Donohoo (*id.*). Mr. Daroui confirmed that no

---

[2] By the time of the hearing the contracting officer had been promoted to Master Sergeant (tr. 2/198-99).

negotiation of licensing terms occurred during the call although the parties briefly discussed activation and installation of the software (tr. 1/52-55, 62-64, 99-100).

9. On August 18, 2010, appellant was notified via email that Contract No. W91B4L-10-P-1475 had been awarded to it. The government attached the contract to the email for appellant's signature. (R4, tab 3) The contract was issued on Standard Form 1449, which the government uses for the purchase of commercial items (R4, tab 1 at 1). The government initially sent an unsigned copy of the contract to appellant, but corrected this inadvertent error the next day (R4, tab 4). The government's email indicated the software should be shipped to the following address:

> SSG Lesly A. Richardson
> Kandahar Airfield (KAF)
> KAF-RCC
> APO, AE 09355
> [Email address omitted]
> Ref: Contract Number W91B4L-10-P-1475

The email also included the following information regarding the point of contact responsible for inspecting and accepting the software.

> CPT Chance Wirey
> [Email address and telephone number omitted]

(*Id.*)

10. The contract had a single line item number (CLIN) which described the supplies being purchased as:

> ENGLISH DARI SOFTWARE
> FFP
> SINGLE USER BI-DIRECTIONAL ENGLISH/DARI
> SOFTWARE LICENSES
> w/1 Year Support and Maintenance
> FOB: Destination
> PURCHASE REQUEST NUMBER: KAF0L3ECE03819

The CLIN indicated the quantity to be purchased was 20 at a Unit Price of $4,840 for a total price of $96,800. (R4, tab 1 at 3)

11. The contract included FAR 52.212-4, CONTRACT TERMS AND CONDITIONS--COMMERCIAL ITEMS (JUN 2010); and FAR 52.212-5, CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS--COMMERCIAL

4

ITEMS (JUL 2010) (R4, tab 1 at 1, 4). The contract reiterated the information the government had provided in the email regarding the delivery address and the point of contact for inspection and acceptance (*id.* at 13).

12. The contract does not include the clause at FAR 52.227-19, Commercial Computer Software License. Nor does the contract specifically address the government's rights to use the software, as required under FAR 27.405-3, Commercial Computer Software, other than the statement in the CLIN that the contract is for 20 single use licenses. FAR 27.405-3(a) states in pertinent part: "If greater rights than the minimum rights identified in the clause at 52.227-19 are needed, or lesser rights are to be acquired, they shall be negotiated and set forth in the contract. This includes any additions to, or limitations on, the rights set forth in paragraph (b) of the clause at 52.227-19 when used." FAR 27.405-3(b) states in pertinent part: "If the contract incorporates, makes reference to, or uses a vendor's standard commercial lease, license, or purchase agreement, the contracting officer, shall ensure that the agreement is consistent with paragraph (a)(1) of this subsection." FAR 12.212 sets forth the policy of the government to acquire commercial computer software pursuant to licenses customarily provided to the public, to the extent such licenses are consistent with federal law and otherwise satisfy the government's needs.

13. Mr. Daroui executed the contract on behalf of appellant on August 19, 2010 (app. supp. R4, tab 14 at 3).

14. Mr. Daroui testified there had been no negotiation before the contract was awarded and the contract was silent with respect to terms appellant viewed as being material, such as the terms of the license agreement, the terms of the warranty, what form the software delivery was to take and how appellant was to be protected from unauthorized use (tr. 1/55-58).

15. Mr. Daroui testified that appellant generally protects itself from unauthorized use of its software by requiring online registration of the software and activation during the installation, which permits appellant to ensure that the software is used only in accordance with the terms of the license granted (tr. 1/40-41, 62-64). He also testified that he discussed this with the contracting officer during the telephone call made by the contracting officer prior to contract award (tr. 1/52-55, 62-64, 99-100).

16. The contracting officer confirmed that he had called appellant shortly before awarding the contract to confirm the price appellant had quoted and to determine whether appellant would be able to meet the government's needs with respect to delivery (tr. 2/206-09, 232-33, 239). He testified that he had no recollection of discussing software registration and activation (tr. 2/240). The contracting officer testified that he believed he was purchasing a commercially available, off-the-shelf product and that the government did not have the right to copy or reproduce the

software (tr. 2/244-45). His testimony also indicated that he had no clear understanding of what a single user software license might entail (tr. 2/227-28, 240).

17. Online registration requires that the user's computer connect with appellant's servers (tr. 1/40-41, 62). When connected, the user, as part of the installation process, must enter a product identification number provided by appellant. Appellant's server, if it recognizes the number entered, will transmit an activation code to the user's computer that activates, i.e., permits the user to use the software (tr. 1/62-63, 2/18-22). During this registration process the identification number of the computer the software is being installed on will be transmitted to appellant's server (tr. 1/40-41, 62-63). In the case of a single use license, if someone attempts to install, activate and register the software on a second computer, appellant's server will know that the software has been activated and registered previously and will not transmit the information necessary to activate this second copy (tr. 1/61-63).

18. Appellant decided to delete the online only registration requirement and modified the software before sending it to the government to permit it to be activated without registration. Appellant decided to do this to facilitate the government's use of the software on the government's secured computers, which do not connect to the internet and because appellant understood the software also would be used on some computers in the field, which might not have access to the internet and because he believed that connection to the internet in Afghanistan was often problematic for computers the government did permit to access the internet. Online registration remained possible, but was not required to use the software. (Tr. 1/40-41, 55-57, 61-65, 97-98, 101-05; R4, tab 21 at 3-9)

19. The government neither requested, nor was aware of appellant's decision to do this (tr. 1/97-98, 2/244). This modification made it possible to install a single copy of the software on more than one computer and also made it easier to make additional, usable copies of the software (tr. 1/61-63, 2/140-42).

20. Other modifications appellant made to the software before delivering it to the government included inserting a unique version number, 4.2, and the contract number, into the software's code along with the 20 product identification key numbers, for each copy of the software. This is a standard practice of appellant and helps it to monitor the usage of its software to ensure it is only used in accordance with the terms of the licensing agreement. (Tr. 1/34-37, 58, 71-72, 105; app. supp. R4, tabs 5, 21 at 3)

21. After the software was modified as discussed above, it was burned onto 20 compact discs (CDs), which were placed in a box, together with written installation instructions, the license agreement and a letter addressed to the contracting officer listing the 20 product identification numbers. The package was addressed to CPT Wirey per the instructions set forth in the contract. (Tr. 1/56-57, 71-76, 106-19; app. supp. R4, tab 16; R4, tab 1 at 3)

22. The license was provided in three different forms[3] (tr. 1/68-70, 73-74, 115-19). The long form license was a written document included in the box of CDs with the CiyaTran software shipped to the government. It stated in pertinent part:

CiyaTran 4.2 License

> CiyaSoft Corporation standard software license agreement does not apply to this agreement: Activation is not online and online registration is not required.
> This is an agreement between CiyaSoft Corporation and Licensee, who is being licensed to use CiyaTran. The Licensee is the US Government and this License Agreement is based on a contract. The contract number is W91B4L-10-P-1475.

> ....

> 2. Each installation should be activated with respective product ID printed on the face of the CD case and *Licensee agrees to provide CiyaSoft Corporation with a list of activations, along with name or initials or computer name or other information to uniquely identify each activation for those activations that do not go through normal registration due to security concerns. Each License permits Licensee to install the Software on only one computer system. Licensee will not make copies of the Software or allow copies of the Software to be made by others.*

(App. supp. R4, tab 8) (Emphasis added) There was also a written, short form of the agreement included on a separate piece of paper with each CD, inside the shrinkwrap surrounding the case (tr. 1/68-70, 73; app. supp. R4, tab 2). The short form in its entirety, stated:

---

[3] The government argues appellant failed to prove the license agreement was included with the software because appellant's witness, Mr. Daroui, testified he did not see the contents of the package that was shipped (gov't br. at 5, 16, 18-19). We are unpersuaded by this argument, given the revisions appellant made to the software and the license agreement to accommodate what it perceived to be the government's needs and the importance to appellant of protecting its software from piracy (findings 18-22). In the circumstances, we find Mr. Daroui's unrebutted testimony that the package included the license agreement in all three forms credible.

7

By breaking the seal, you accept the terms of the license agreement for contract W91B4L-10-P-1475, CiyaTran Version 4.2. *This CD can be used for installation on one computer system only.* Each installation should be activated with the respective product ID printed on the face of the CD case. This CD should not be copied into another CD, hard disk or any other storage device. If [t]his CD is defective, contact CiyaSoft Corporation for a replacement. We will pay for the cost of sending a replacement CD.

(App. supp. R4, tabs 7, 17) (Emphasis added) Appellant's witness, Mr. Ameen Manghi, described the shrinkwrap form of the license agreement as being typical for software he has installed[4] (tr. 2/86-87). Finally, the software installation wizard used during the installation process included a clickwrap form of the license agreement[5] (app. supp. R4, tab 1 at 2;

---

[4] Mr. Manghi, who has a bachelor's degree in computer science and engineering and was employed as a senior firmware engineer for a manufacturer of computer hard drives was repeatedly referred to as an expert witness and asked a number of general questions relating to computers and software code unrelated to having personal knowledge of facts specific to appellant's performance of the contract, i.e., he was treated like an expert witness and offered a number of opinions on technical matters relating to computer science and software generally and specifically with regards to aspects of appellant's source code for its translation software relating to the installation, registration and activation thereof. Although appellant never formally offered Mr. Manghi as an expert witness, the government never posed an objection to any of the questions appellant asked Mr. Manghi, nor otherwise took issue with appellant's characterization of Mr. Manghi as an expert. The government considered retaining an expert to rebut Mr. Manghi's testimony, but after deposing him, elected not to do so. (Tr. 2/7-173) We find Mr. Manghi's testimony both generally credible and helpful to understanding certain technical aspects relating to the dispute.

[5] "Clickwrap" and "shrinkwrap" are terms used within the software industry. "Clickwrap" refers to an agreement that must be agreed to during the installation process. Assent is manifested by clicking an "I agree" or similar button in a dialog box or pop-up window that appears during the software's installation. The terms do not necessarily need to be viewed by the user to be agreed to. *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015); *Fjeta v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012). "Shrinkwrap" refers to an agreement found within the packaging, the specific terms of which do not become known until the software has been purchased and the buyer opens the packaging. Assent is presumed from the opening of the

tr. 2/62-65). During the installation process a window opened on the computer's screen in which the following appeared:

> License Agreement
> CiyaSoft Corporation Standard license agreement does not
> apply to this agreement.
> This is an agreement between CiyaSoft Corporation and
> Licensee, who is being licensed to use CiyaTran. The
> Licensee is the US Government and this License
> Agreement is based on a contract. The contract number is
> W91B4L-10-P-1475.

(App. supp. R4, tab 1 at 2) The software could not be installed and used unless the user agreed to the licensing agreement by clicking on the acceptance button and entering the correct product key number that was unique to the copy of the software being used (tr. 2/66-70; app. supp. R4, tab 1 at 6-8). What appeared in the window however does not indicate what the terms of the license agreement are. Most notably, it does not indicate that the license is a single use license (app. supp. R4, tab 1 at 2). The record does not indicate whether the terms of the agreement were accessible within the software itself by clicking on another button during the installation process.

23. The software was delivered to the government on September 18, 2010, in Afghanistan as required via U.S. mail (R4, tab 7).

24. The contracting officer never saw the software package, or its contents, upon its delivery (tr. 2/215; R4, tab 28, ¶ 4). He also testified that he never discussed, nor saw the licensing agreement, prior to being deposed during the discovery process (tr. 2/215, 241; R4, tab 28, ¶ 5).

25. The software package was addressed and delivered to CPT Wirey as specified in the contract (app. supp. R4, tab 16). MAJ Wirey[6] testified he had no recollection of having received the package, but that he probably would have opened the box and counted the number of copies present. He would not have looked for and read the licensing agreement. He also testified that he neither installed, nor saw anyone else install the software. He acknowledged that it was possible the licensing agreement was in the box with the software. (Tr. 2/257-77) He stated that he probably would have given the package to his S4, the supply and logistics shop, which was

---

shrinkwrap encasing the software and use of the software thereafter. *Specht v. Netscape Communications Corp.*, 150 F. Supp. 2d 585, 592 (S.D.N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002).

[6] CPT Wirey had been promoted to Major by the time of the hearing. We will refer to him as MAJ Wirey hereafter.

where the property book officer was located and which was responsible for distributing the software to the communication shop, which in turn was responsible for installing software (tr. 2/257-58, 262-63, 266, 269).

26. By email dated October 4, 2010, the contracting officer confirmed MAJ Wirey had received the package sent by appellant (ex. A-2). Appellant submitted its invoice dated October 9, 2010, for the full contract price (R4, tab 6). The contracting officer prepared a memorandum for the record confirming the software had been received and authorized full payment on October 14, 2010 (R4, tab 7).

27. Appellant suspected the licensing agreement was being violated when there were multiple registrations for the same product ID number within a few days of the software's delivery (tr. 1/77-78, 121-22). Mr. Manghi reviewed information taken from appellant's servers relating to the registrations, which in his opinion conclusively established that one copy of the software, corresponding to the product key, "7E05FE4B78AFDAEF," sent to the government, had been installed on two computers. The first identified as "43@C,225DI" and the second identified as "43@C.225DL." (Tr. 2/125-32; app. supp. R4, tabs 2, 5, 20) Appellant's representative, Mr. Daroui, testified that these registrations were made by SPC Sahar (tr. 1/78, 121). This was based on the registrations coming from an U.S. Army email address assigned to SPC Sahar (app. supp. R4, tab 20). SPC Sahar testified that his duties in Afghanistan were to interpret and translate English to Dari and Dari to English (tr. 2/175, 180, 182-83). He did not recall ever having installed software on his government laptop. He stated that it was generally the responsibility of the communications shop to handle software installation. (Tr. 2/186-87, 192) MAJ Wirey also testified that it was the responsibility of the communications shop to handle matters related to computers and software (tr. 2/257-58).

28. Appellant initially ignored the multiple registrations, thinking the government had made a mistake during the installation process, but within a few months of delivery, attempted to contact the contracting officer to request a list of the registered users per the requirement set forth in paragraph 2 of the licensing agreement (tr. 1/77-78, 121-22; app. supp. R4, tabs 8, 9). At the time the contracting officer was away on leave for Christmas (tr. 1/78, 2/199, 229). The contracting officer stated he may not have replied to appellant's email because when he returned from Christmas he had hundreds of emails in his inbox (tr. 2/230). He also testified that after he left, a replacement contracting officer would have been appointed, but that for a commercial items contract such as appellant's he was not aware of any requirement that the contractor be advised of the replacement (tr. 2/226-27, 230-31).

29. Appellant also began to receive technical support inquiries regarding CiyaTran Version 4.2 from non-registered users, including one user, Mr. Mohamed Aminy, who was a former employee of two contractors providing translation services to the

government in Afghanistan.[7] Mr. Aminy testified he received his copy from an employee of the first translating/interpreting services company he worked for in Afghanistan. The product ID number he provided to appellant was also for one of the copies that had been licensed to the government, although not the same one that had been registered to SPC Sahar's email account. (Tr. 1/86-87, 166-72; app. supp. R4, tab 21 at 2)

30. Mr. Aminy testified that an employee from Mission Essential Personnel (MEP), which provided translation services to the government in Afghanistan, installed CiyaTran 4.2 software on his computer in 2012, while he was working for another company, Worldwide Language Resources, providing translation/interpretation services to the government. He observed the employee from MEP installing the software on multiple MEP and Worldwide Language Resources employees' laptops. He was certain the installer was not a government employee, but rather was an employee of MEP. (Tr. 1/161-73, 177; app. supp. R4, tab 21) It was not clear from his testimony whether it was the same copy of the software that he witnessed being installed on multiple computers. Nor was it established from his testimony how many copies were installed, particularly whether more than 17 copies were involved. In response to a government interrogatory, appellant indicated that Mr. Aminy had identified, by name, five managers from the translation services contractors he had worked for in Afghanistan that he claimed had copies of appellant's software. (R4, tab 21 at 8) Appellant elected not to provide any testimony or other evidence from these individuals.

31. Appellant also introduced evidence indicating that copies of the software accompanied by another product ID number that had been included with the 20 licenses sold to the government had been purchased in Kabul, Afghanistan, and Mashad, Iran (tr. 1/87-89, 2/122-25; app. supp. R4, tab 10 at 2-6, tab 23). No other evidence regarding these copies was entered into the record.

32. The record indicates that appellant was only able to confirm installation and registration for four copies of the software (tr. 1/40, 78). In addition to the two registrations linked to SPC Sahar, appellant identified two more registrations by two other individuals (R4, tab 21 at 5-7). Appellant provided no further evidence relating to these two additional registrations, i.e., whether the individuals were employees of

---

[7] His email address indicates his last name is Aminy (app. supp. R4, tab 21). He was also identified as Mr. Aminy during his deposition (R4, tab 22). At the hearing he was identified as Mr. Amiry (tr. 1/141). Both the government and appellant refer to him as Mr. Aminy in their post-hearing briefs. From the testimony that was elicited from him at his deposition and the hearing we are confident Mr. Aminy and Mr. Amiry are one and the same. The record includes no explanation for the differences in the spelling and apparent pronunciation of his name, but most likely reflects an error in the hearing transcript. We refer to him as Mr. Aminy.

the government, employees of contractors providing translation services to the government, or how these individuals obtained their copies of the software. The record includes no evidence regarding the other 17 copies. The government never provided appellant with a list of the computers or individuals the software had been assigned to. (Tr. 1/79-80) Appellant is unaware of how many copies of Version 4.2 of its software may have been installed (R4, tab 21 at 4).

34. Appellant also entered into evidence an email exchange it had with LT Huang of the U.S. Navy in March 2013. LT Huang expressed an interest in CiyaTran, Version 4.2, and wanted to know if it had been approved for government use. In response to a question from appellant, LT Huang stated she was not part of the unit down in Kandahar, referring to the 2/101 BCT, but that she was aware that they have a copy of the software. (Tr. 1/84-86; ex. A-1)

34. The contracting officer never responded to appellant's inquiries. He was either out of the country for Christmas or had completed his tour of duty and departed whenever appellant attempted to contact him. Appellant tried calling him and when that was unsuccessful after several attempts, sent another email inquiry to MAJ Wirey a few months later, in late 2012. (Tr. 1/78-80, 122-23; app. supp. R4, tab 9 at 3) This appears to be the only attempt appellant made to contact MAJ Wirey that went unanswered. The only other evidence in the record of an attempt by appellant to contact MAJ Wirey resulted in an almost immediate response from MAJ Zmijski, who identified himself as a contracting officer (R4, tabs 9, 10). Although appellant was not aware of it at the time, the contracting officer finished his tour of duty in early 2011 and was no longer in Afghanistan when appellant was sending him email queries (tr. 1/78-80, 122-23, 2/200). After he left, he no longer had access to the email address that was assigned to him when he was in Afghanistan (tr. 2/251-52). The record includes no evidence concerning the period of time during which MAJ Wirey served as the point of contact, or whether a successor was appointed to replace him.

35. In November 2013, appellant sent a letter addressed to MAJ Wirey, or successor contracting officer as well as the Army's Contract Law and Intellectual Property Divisions in which it expressed concern that the licensing agreement was being, or had been, violated and requested assistance from the Army in determining whether this had occurred. Specifically, appellant requested that it be provided with the names of the organizations and individuals who may have used the software provided under the licensing agreement with the government. (R4, tab 9; tr. 1/126-28) In response, the government advised it had made a preliminary examination of its computer systems and had not found any one using the software (R4, tab 11 at 2).

36. In January 2014, appellant advised it was considering legal action for breach of contract and patent infringement unless the government responded to a

12

number of questions appellant set forth in its letter (R4, tab 12). In response to appellant's letter, the government in pertinent part stated:

> We have conducted a thorough review of our computer network, the related contract file, and have questioned personnel related to this procurement. We did not locate any copies of CiyaSoft CiyaTran software on any of the computers in the network. We did not locate any record of CiyaSoft CiyaTran software on Army property books. We have found no information indicating that the U.S. Army currently uses or maintains the software in question. We also found no evidence that the U.S. Army allowed unauthorized copies of the software to be produced.

(R4, tab 13) The government was never able to provide appellant with a list of activations (tr. 1/79; app. supp. R4, tab 28).

37. Under date of April 15, 2014, appellant filed a claim with the successor contracting officer. In its claim appellant asserted the government breached the contract and infringed its copyright. (R4, tab 15) With respect to the breach of contract assertion, appellant alleged the government made unauthorized copies, provided the software to its contractors, who also made unauthorized copies of the software with actual or imputed knowledge of the government and failed to secure and protect the software as required by the terms of the contract. The claim included a Contract Disputes Act (CDA) certification in the amount of $17,908,000, but was not signed. (*Id.*) Appellant calculated its damages based on its estimate that there were 37,000 translator/interpreters working for the government in Afghanistan and further estimate that 10% of them, or 3,700 had obtained unlicensed copies of the software.[8] Appellant

_____

[8] The only evidence we find in the record concerning the number of translator/interpreters in Afghanistan is in a report entered into the record by appellant. The report appears to have been prepared by an office within the Department of Defense (DoD), but appellant provided no testimony with respect to the document. The report also appears to indicate that during the first quarter of 2013 there were 5,796 translator/interpreters working for DoD in Afghanistan. (App. supp. R4, tab 35) The record includes some evidence of total dollar amounts the government spent for translator/interpreter services, but does not indicate how many personnel were involved (app. supp. R4, tab 33). The record also includes some evidence of the total number of contractor personnel that were in Afghanistan yearly from 2007 to mid-2016, but other than security personnel, there is no breakdown for the types of services provided, which the record indicates include, construction, transportation, security, base support, intelligence analysis and translation/interpretation (app.

did not provide any evidence to support these estimates. The contract price for a single license $4,840, multiplied by 3,700, yields appellant's claimed damages. (ASBCA No. 59519 (59519), compl. at 6; R4, tab 21)

38. The contracting officer denied the claim in a decision dated June 2, 2014 (R4, tab 16). Among the bases for the contracting officer's denial, were that appellant had failed to demonstrate that more than 20 copies of the software had been used, that there were no terms in the contract specifying the measures the government was to take to secure and protect the software, and that appellant had failed to demonstrate its copyright had been infringed. The contracting officer also relied upon appellant's failure to have signed the claim in the denial. (*Id.*)

39. Appellant filed a notice of appeal under date of August 26, 2014, which was docketed as ASBCA No. 59519 (R4, tab 17). The government initially moved to dismiss, arguing jurisdiction was lacking because there was no valid claim due to appellant's failure to have signed the claim and certification. Appellant filed its complaint, which included a signed certification under date of October 23, 2014. This was treated as a new claim and the contracting officer issued a final decision dated March 30, 2015, in response thereto, reiterating the reasoning of the previous decision minus the argument there was no valid certification (R4, tab 19).

40. In the new claim, as an alternate explanation for the copies asserted to have been placed on the contractor personnel's computers in violation of the licensing agreement, appellant asserted the software could have been stolen (59519, compl. at 5). The new claim refers to all three forms of the license agreement and specifically asserts that appellant assumed the Army had systems in place "in order to prevent copying and duplicate assignment of licenses" (*id.* at 3). Appellant also asserted "the license agreement does not allow copies of the Software to be made and restricts only one installation per Product ID...yet some Product ID's were registered more than once" (*id.*). Appellant additionally asserted that it had sent the contracting officer an email informing the contracting officer of duplicate registration attempts (*id.* at 4). Finally appellant asserted:

> The Software was licensed pursuant to a clear mutual understanding that each CD was for use on one computer system only. Even without those explicit notices and the license agreement, it would be common sense, customary, standard practice of the industry and could be implied from

---

supp. R4, tab 31). This record does not support finding that there were 37,000 translator/interpreters as appellant contends. There is no evidence in the record at all to support the contention that 10% of this total had unauthorized copies of appellant's software.

the fact that physical CD's were requested to be shipped, that the Software was for use on one computer system only per Product ID.

(*Id.* at 5) Appellant's new claim also asserted "The Software's one-year maintenance and technical support under the contract expired October 2011 and the Army did not renew it. But, towards the end of 2011, and during 2012, CiyaSoft received a few anonymous inquiries for technical support, questions on specific features of our MT software (CiyaTran™) and requests for upgrades." Appellant asserted it found this to be unusual, but in an effort to maintain a good relationship with the government that it continued to provide support a few months beyond the expiration date of the maintenance agreement. (*Id.* at 4)

41. Appellant appealed the March 30, 2015 final decision under date of April 6, 2015, which was docketed as ASBCA No. 59913. The Board treated the pleading and new appeal as protective in nature and consolidated them for hearing purposes without ruling on the government's initial motion to dismiss ASBCA No. 59519 for lack of jurisdiction.

## DECISION

*The Parties' Contentions*

Appellant argues it has proven six[9] specific breaches of contract by the government: (1) The government breached the contract by installing the same copy of the software on more than one computer. (2) The government breached the contract by using the software for more than one year. (3) The government breached the contract by not providing a list of activations or registered users. (4) The government breached the contract by letting users other than personnel assigned to the 2nd BCT use the software. (5) The government breached the contract by failing to keep the software from being copied and distributed by others, particularly its translator/interpreter services contractors. (6) The government breached the contract by failing to provide a point of contact throughout the contract. (App. br. at 26-27)

The government argues that because the licensing agreement, in all of its forms, is not part of the contract, any violation of the licensing agreement cannot constitute a breach of contract (gov't br. at 12-23). The government also argues that even if one were to

---

[9] Appellant, a *pro se* litigant, listed the breaches in seven numbered paragraphs, but paragraphs Nos. 3 and 4 allege variations of the same breach, failure to provide a list of activations. Other paragraphs also include repeated variations of other identical breaches enmeshed in a hodgepodge style of statements which makes it difficult to discern precisely what the asserted breach, or breaches, are and how they may differ from those asserted in the other paragraphs. We distill the seven paragraphs to state six separate breaches in total as set forth above.

15

assume *arguendo*, the licensing agreement was part of the contract, appellant has failed to establish the government had a duty under the agreement that it failed to perform, asserting that none exists because none are expressly stated in the contract (*id.*). The government also argues we lack jurisdiction to consider some of appellant's asserted breaches because they constitute claims that have never been presented to the contracting officer. Specifically, the government argues that appellant never claimed the contract had been breached by the installation of a single copy of the software on more than one computer and by using the software for more than a year. (*Id.* at 27-29) Finally, the government also moves to strike portions of appellant's reply brief, arguing appellant introduced new evidence in its reply, specifically the physical locations of two servers, asserted to be owned by DoD, which SPC Sahar's email registrations passed through on their journey to appellant's server (59519, gov't mot. at 1).[10]

*Issues*

The appeal presents the following issues: (1) Does the Board have jurisdiction to consider all six of the specific breaches appellant argues have occurred, (2) can the government be bound by a software licensing agreement, the terms of which it is not made fully aware of until after the contract is awarded and it receives the software, and (3) if so, has the government violated the terms of the licensing agreement?

*The Jurisdictional Issues[11]*

We begin by addressing the government's argument that two of the six asserted breaches constitute new claims, not considered by the contracting officer and thus the Board has no jurisdiction to consider and decide them (gov't br. at 1 n.1, 27-30). Jurisdiction must be established before the Board is able to address the merits of a claim. *Hambsch v. United States,* 857 F.2d 763, 863 (Fed. Cir. 1988). We note the government's argument is based on references to the original, uncertified claim, not the second, certified claim (gov't br. at 27 (citing R4, tabs 15, 19)). The revised claim includes express assertions that the licensing agreement only permits each copy of the software to be installed on a single computer (findings 39-40). With respect to the

---

[10] This last issue was mooted by appellant's response to the motion, which stated appellant had no objection to the government's motion (59519, app. resp.). Our decision does not rely on the stricken evidence.

[11] For clarity sake, we hold that appellant's initial submission to the contracting officer was not a claim due to the absence of a signed certification (finding 37). As such, we lack jurisdiction to consider the appeal from that submission. However, the revised signed claim submitted to the contracting officer on October 23, 2014, was proper and thus we use the date for the revised claim. As the pleadings were consolidated, all references to the claim refer to the initial complaint filed in the earlier appeal.

breach asserted arising from the government's use of the software for more than a year, the revised claim includes at best, only elliptical references thereto (finding 40).

The CDA, 41 U.S.C. §§ 7101-7109, requires contractors to submit all claims to a contracting officer for final decision. 41 U.S.C. § 7103(a). The submission of the claim is a prerequisite to jurisdiction of an appeal from the contracting officer's final decision. *Shaw Environmental, Inc.*, ASBCA No. 57237, 12-1 BCA ¶ 34,956. The Federal Circuit has stated that claims need not be submitted in any particular form, or use any particular wording, but what is required is for the contractor to provide a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim. *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987). Whether a sufficient claim has been presented to the contracting officer is a question of judgment, which is exercised on a case-by-case basis. *Holk Dev., Inc.*, ASBCA Nos. 40579, 40609, 90-3 BCA ¶ 23,086 at 115,938.

The record establishes appellant's revised claim includes specific assertions that each copy of the software should have been installed on only one computer. The claim states: "the license agreement does not allow copies of the Software to be made and restricts only one installation per Product ID...yet some Product ID's were registered more than once." The claim also asserts the contracting officer was sent an email complaining about duplicate registration attempts and that the software had been licensed pursuant to a clear mutual understanding that each CD was for use on one computer system only as well as that the software was for use on one computer system only per Product ID. (Findings 39-40) We find these assertions provided the contracting officer with adequate notice of the basis for this claim and thus we have jurisdiction to consider the merits of this claim.

With regard to the government's second contention, appellant's revised claim only mentions that the government failed to renew the technical support agreement and that appellant received requests for technical support after the contract expired, which appellant sought to fulfill because it wished to maintain a good relationship with the government (finding 40). The language used by appellant does not convey that appellant found this objectionable and was seeking compensation from the government for continuing to use the software after the period for technical support had expired. In fact the statement that appellant found the post-performance period inquiries unusual, but responded in an effort to maintain a good relationship with the government, suggests appellant made a business decision to continue to provide technical support when it was not contractually required to do so, i.e., that there was no claim contemplated. We find the revised claim does not include language sufficiently clear to give the contracting officer an understanding that appellant was claiming the contract had been breached by the government's continued use of the software for

17

more than a year.[12]  Accordingly we lack jurisdiction to consider this assertion and dismiss it without prejudice.

### *The Licensing Agreement is Part of the Contract*

The government argues that it could not have breached the provisions of the licensing agreement because it was not part of the contract.  In support of this argument the government relies on the fact that the contracting officer never discussed any terms of a licensing agreement with appellant, never saw the licensing agreement, the contract is silent regarding any licensing agreement terms, the contract was never amended to include a licensing agreement and to the extent MAJ Wirey, the point of contact, may have seen the licensing agreement when the package was received, he was not authorized to revise the contract by accepting the terms of the licensing agreement. (Gov't br. at 12-19; findings 7-9, 14, 24-25)  While we do not disagree with the government's factual assertions, we draw a different conclusion.

The interpretation of a contract begins with the language of the written agreement. *Agility Public Warehousing Company KSCP v. Mattis*, 852 F.3d 1370, 1383-1384 (Fed. Cir. 2017) (citing *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *see also Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004)) ("When construing a contract, a court first examines the plain meaning of its express terms.").  The contract is considered as a whole and interpreted so as to harmonize and give meaning to all of its parts. *Id.*  In this case the contract expressly states that it is for 20 "single user bi-directional English/Dari software *licenses*" (finding 10, emphasis added).

If not the licensing agreement advanced by appellant then what is the licensing agreement that the contract refers to?  The government has proffered no alternative.  Furthermore, the government never requested the opportunity to review the license prior to awarding the agreement, did not object to the license upon its receipt, did not include the Commercial Computer Software License clause set forth at FAR 52.227-19 in the contract, and the contract does not specifically address the government's rights to use the software, as required under FAR 27.405-3, other than the statement in the CLIN that the contract is for 20 single use licenses.  Whether the aforementioned

---

[12] We are mindful that appellant is a *pro se* litigant. *Pro se* litigants are given leeway by the Board with regard to administrative matters, but are otherwise accorded no special consideration. *See Environmental Safety Consultants, Inc.*, ASBCA No. 47498, 00-1 BCA ¶ 30,826 at 152,143.  We cannot excuse or ignore appellant's less than clear claim language and assume jurisdiction simply because appellant elected to proceed *pro se* and may not have been sufficiently aware of the legal criteria involved for stating a claim.

18

lapses are attributable to conscience decisions by the contracting officer or to his lack of experience in contracting for software is not explained in the record. (Finding 6)

In any event, it does not matter that the licensing agreement was neither negotiated, nor the terms known by the contracting officer. It is the policy of the government, when licensing commercial software to accept the licensing terms customarily provided by the vendor to other purchasers, as long as the license is consistent with federal law and otherwise satisfies the government's needs. FAR 12.212. At the time the contract was awarded in 2010, the FAR included no provisions addressing clickwrap and shrinkwrap forms of licensing agreements, the terms of which are generally not known to the user until the software has been paid for and delivered to the user, but has since 2013 implicitly recognized them.[13] In this regard the FAR is in accord with the current commercial law of many jurisdictions, which generally recognize and enforce terms of licensing agreements, which are neither negotiated nor known to the user until the software has been paid for and delivered. *Moore v. Microsoft Corp.,* 741 N.Y.S.2d 91, 92 (N.Y. App. Div. 2002) (clickwrap license agreement upheld); *Feldman v. Google, Inc.,* 513 F. Supp. 2d 229, 233 (E.D. Pa. 2007) (clickwrap agreement enforceable); *Recursion Software, Inc. v. Interactive Intelligence, Inc.,* 425 F. Supp. 2d 756, 782–84 (N.D. Tex. 2006) (finding clickwrap agreement valid and enforceable, but denying summary judgment on breach of contract claim due to issues of material fact); *I. Lan Systems, Inc. v. Netscout Serv. Level Corp.,* 183 F. Supp. 2d 328, 338–39 (D. Mass. 2002) (clickwrap agreement upheld); *M.A. Mortenson Co. v. Timberline Software Corp.,* 140 Wash. 2d 568, 998 P.2d 305 (2000) (never viewed shrinkwrap agreement provisions enforced); *Hill v. Gateway 2000, Inc.* 105 F.3d 1147 (7th Cir. 1997) (enforcing shrinkwrap license terms); *Chamberlain v. LG Electronics U.S.A., Inc.,* 2017 WL 3084270 (C.D. Cal. 2017) (noting New York, Washington, and Florida enforce shrinkwrap licensing terms); *see also* Robert J. Morrill, *Contract Formation and the Shrink Wrap License: A Case Comment on ProCD, Inc. v. Zeidenberg,* 32 New Eng. L. Rev. 513 (Winter 1998), which discusses the evolution in the law over the recent decades, in which courts moved from almost uniformly initially refusing to enforce shrinkwrap licensing agreements, to the current status where such agreements are more accepted and enforced due to the underlying change in the way business is currently conducted.

We note also that the law generally does not permit a party to avoid the terms of a contract on the ground that he or she failed to read it. *Hirsch v. Citibank, N.A.,* 542 F. App'x 35, 37 (2d Cir. 2013); *see also Giesler v. United States,* 232 F.3d 864 (Fed. Cir. 2000) (contractor's failure to read specification amounted to gross negligence); *Fraass Surgical Mfg. Co. v. United States,* 215 Ct. Cl. 820, 830 (1978) (failure to read

---

[13] *See* FAR 12.216 and references to "click-wrap and "browse-wrap" licensing agreements in FAR 52.212-4(u)(ii), which expresses an objection only to any indemnification provisions that might be included, which would violate the Anti-Deficiency Act, 31 U.S.C. § 1341.

19

contract irrelevant, contractor should have known better); *Richardson Camera Co. v. United States*, 199 Ct. Cl. 657, 665 (1972) (failure to read contract not a defense to consequences of such an omission).

In this case, despite a contract expressly purchasing software licenses, the government never requested the opportunity to review the terms of the license prior to awarding the contract, nor did it object to the license upon its receipt. Where the assent to terms of a contract is largely passive, as is usually the case with software licensing agreements, courts have often based the decision of whether to enforce the contract on whether a reasonably prudent offeree would be on "inquiry" notice of the terms at issue. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120, 126–27 (2nd Cir. 2012). Inquiry notice, or constructive notice, is actual notice of circumstances sufficient to create a duty of inquiry and has been routinely found to apply to the government previously in cases involving bid mistakes and ratification, amongst others. *See, e.g., Carl J. Bonidie, Inc.*, ASBCA No. 25769, 82-2 BCA ¶ 15,818 (knowledge of extra work directed by Base Engineer imputed to the contracting officer); *Williams v. United States*, 130 Ct. Cl. 435 (1955) (knowledge imputed to contracting officer resulted in ratification of unauthorized act); *Chernick v. United States*, 178 Ct. Cl. 498 (1967) (contracting officer should have known of bid mistake). The 2nd Circuit in *Schnabel*, 697 F.3d at 124, stated:

> Courts, including this one, have concluded as a matter of law in some circumstances that parties were on inquiry notice of the likely applicability of terms to their contractual relationship even when those terms were delivered after that relationship was initiated. These decisions appear to have in common the fact that in each such case, in light of the history of the parties' dealings with one another, reasonable people in the parties' positions would be on notice of the existence of the additional terms and the type of conduct that would constitute assent to them.

Based on the foregoing, it does not matter that the contracting officer had no actual knowledge of the terms of the licensing agreement. The circumstances support finding the contracting officer had a duty to inquire as to its terms, which he failed to do, and to impute knowledge of same to him. Accordingly, based on the fact that it is, and has been, the policy of the federal government prior to the award of the contract to accept the terms of licensing agreements offered by vendors of commercial software that are customarily provided by the vendor to other purchasers and that vendors of commercial software have long included shrinkwrap and clickwrap license agreements with their software, which many courts have found to be valid, enforceable contract terms and the FAR currently also recognizes the validity of clickwrap and shrinkwrap licenses, we find the contract included the licensing agreement appellant shipped with

its software. We also hold the government can be bound by the terms of a commercial software license it has neither negotiated nor seen prior to the receipt of the software, so long as the terms are consistent with those customarily provided by the vendor to other purchasers and do not otherwise violate federal law.

Ruling the contract includes the license agreement raises two further issues: (1) did the contract involve commercial software, and (2) was the license agreement provided to the government one customarily provided to other purchasers? These were not issues discussed by the parties in their briefing, but we address them given the discussion above regarding the government's policy regarding commercial software and how it factors into this decision. We find the record and law are sufficiently clear to decide the issues without additional input from the parties.

*The Contract was for Commercial Software*

The FAR includes a definition of "Commercial computer software." FAR 2.101. The FAR defines this term as any computer software that is a "commercial item," which in pertinent part is defined as:

> (1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and—

> (i) Has been sold, leased, or licensed to the general public; or,

> (ii) Has been offered for sale, lease, or license to the general public;

> (2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation;

> (3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for—

> (i) Modifications of a type customarily available in the commercial marketplace; or

21

(ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process. Factors to be considered in determining whether a modification is minor include the value and size of the modification and the comparative value and size of the final product. Dollar values and percentages may be used as guideposts, but are not conclusive evidence that a modification is minor;

(4) Any combination of items meeting the requirements of paragraphs (1), (2), (3), or (5) of this definition that are of a type customarily combined and sold in combination to the general public;

....

(8) A nondevelopmental item, if the procuring agency determines the item was developed exclusively at private expense and sold in substantial quantities, on a competitive basis, to multiple State and local governments.

One could argue appellant's software does not completely meet this definition because it has not been sold to the general public customarily (finding 2). Nonetheless, we find appellant's software to be commercial software within the meaning of the FAR because it was developed without any government funding, appellant has sold it to at least one non-governmental entity, its function, translating one language to another, is not inherently governmental or non-commercial, the record includes some evidence that it is a product that has been sold to the public, albeit in an allegedly unauthorized manner, and most importantly, the contracting officer considered it to be a commercial item, and purchased the licenses under a FAR Part 12, commercial items contract (findings 2, 9, 11, 16-18, 31). The record also includes evidence that appellant modified the software by deleting the online registration requirement and inserting a unique version number and the product identification key numbers (findings 18-20). We do not regard deleting the online registration requirement, which appellant unilaterally elected to make believing it would facilitate the government's use of the software, to change the software's commercial status. First, the change does not affect the core purpose of the software, which is translation. Second, the change merely substituted one form of registration for another. It did not add any requirement that was not previously required. It merely changed the way the registration was to be made, from an online only process

to permit both online and non-online registration. (*Id.*) The same is true for the insertion of the version number and product identification numbers. We view these changes as being non-material and not affecting the software's "commercial" status under the FAR.

*The License Agreement does not Differ Materially from Appellant's Standard License Agreement*

An argument could also be made that the license agreement was not the standard license agreement that appellant offered to its other customers. This also is an important factor in our decision, given the policy set forth in FAR 12.212 for the government to acquire commercial software pursuant to licenses *customarily provided to the public*. This argument would center on the fact that the long form of the license that appellant sent with the software expressly states it is not appellant's standard license agreement, reflecting the insertion of the requirement that the government provide appellant with notice of the software's activation that appellant made to the licensing agreement. (Finding 22)

Although the record includes no copy of appellant's standard single use license, it is evident from the totality of the testimony of appellant's witnesses, Messrs. Daroui and Manghi, that the license agreement appellant included with the software shipped to the government differed from its standard license in only one way, i.e., the addition of the requirement that the government provide appellant with a list of the activations, which appellant felt was needed after it deleted the online registration process (findings 17-18). Ordinarily, the activation occurs automatically as part of the online registration, but due to appellant's decision to delete the online registration, activation notification had to be provided by other methods and appellant added the activation notification requirement to the license agreement to reflect this (*id.*). The core function or purpose of the license agreement, to grant permission for use on only one computer system per copy of the software, did not change. Nor did the requirement for notice of activation change, only the form of the notice changed. We find the license agreement appellant provided to the government did not differ materially from that which appellant customarily provided to other purchasers of its software.

*The Government Breached the Contract*

We turn now to the issue of whether the government breached the contract as alleged by appellant. As the claimant, appellant bears the burden of proving an affirmative, monetary claim against the government by a preponderance of the evidence. *M.A. Mortenson Company*, ASBCA No. 53062 *et al.*, 01-2 BCA ¶ 31,573, and cases cited therein. Appellant must establish liability, causation, and resultant injury. *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc); *see also Wunderlich Contracting Co. v. United States*, 173 Ct. Cl. 180 (1965). The elements of a breach of contract claim are:

(1) a valid contract between the parties; (2) an obligation or duty on the part of the government arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. *Lockheed Martin Integrated Systems, Inc.*, ASBCA Nos. 59508, 59509, 17-1 BCA ¶ 36,597 at 178,284 citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Military Aircraft Parts*, ASBCA No. 60009, 16-1 BCA ¶ 36,388 at 177,410; *Northrop Grumman Systems Corporation Space Systems Division*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,237). To succeed, appellant must prove all four of the elements.

We have already determined appellant has proven the first element. The government argues appellant cannot prove the second element because no duties are expressly set forth in the license (gov't br. at 23-27). We agree in part and disagree in part. We agree with the government with respect to appellant's assertions that the government breached the contract by permitting users other than personnel assigned to the 2nd BCT use the software. There is no evidence that this was a duty placed upon the government by the license. The license includes no such limitation. Both the long form and clickwrap versions of the license identify who the licensee is. Both versions expressly state the licensee is the "US Government." (Finding 22) We interpret this to mean any government employee, or employee of a contractor acting on behalf of the government or other agent of the government, may use the software, so long as it is not installed on more than 20 computers total. If appellant intended to restrict the use of the software to government employees assigned to the 2nd BCT solely, it needed to clearly say so in the license. Consequently, appellant has failed to establish the government had any duty to limit use of the software only to personnel assigned to the 2nd BCT and thus is unable to prove this asserted breach of the contract. Thus we need not address the remaining two elements with respect to this claimed breach.

This leaves four remaining asserted breaches; that the government installed the same copy of the software on more than one computer, the government failed to provide a list of activations, the government failed to keep the software from being copied and distributed to others, and the government failed to maintain a point of contact during contract performance. The first two involve duties that are expressly set forth in the license. The license, both the long form and the shrinkwrap versions, clearly states the software is only for use on a single computer system and is not to be installed on multiple computers. We find this language clearly expresses a duty. Similarly, the long form version of the license clearly sets forth the government's duty to provide appellant with a list of the activations. (Finding 22) Accordingly, appellant has satisfied the second element of a breach claim with respect to these two asserted breaches.

We agree with the government that there is no express duty set forth in the license with regard to the last two asserted breaches. This does not necessarily lead to a finding that the license included no duty the government may have violated. It is well established that contracts can include implied duties, such as the duty of good

24

faith and fair dealing. *SIA Construction, Inc.,* ASBCA No. 57693, 14-1 BCA ¶ 35,762 at 174,986 (citing *Metcalf Construction Co. v. United States,* 742 F.3d 984, 990 (Fed. Cir. 2014)). The implied duty of good faith and fair dealing is limited by the circumstances involved in the contract. The implied duty prohibits acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value. *See First Nationwide Bank v. United States,* 431 F.3d 1342, 1350 (Fed. Cir. 2005) (duty was breached by legislation that "changed the balance of contract consideration"). The Supreme Court has addressed implied duties in contracts stating:

> [A] contract includes not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made, 3 Williston on Contracts, § 1293; *Brodie* v. *Cardiff Corporation,* [1919] A. C. 337, 358[)]....

*Sacramento Navigation Co. v. Salz,* 273 U.S. 326, 329 (1927). The Board also has indicated that when considering implied duties that the circumstances involved in the contract must be considered. *Free & Ben, Inc.,* ASBCA No. 56129, 09-1 BCA ¶ 34,127 at 168,742 (citing *Coastal Government Services, Inc.,* ASBCA No. 50283, 99-1 BCA ¶ 30,348 at 150,088). The government argues:

> As CiyaSoft would have it, the Board should read into every software contract a nebulous implied duty on behalf of the agency to safeguard and protect the vendor's software. Such a reading of a government contract is not only inapposite to the well-established principle that terms of a contract should be expressed therein. Moreover, where, as here, CiyaSoft could pursue a copyright infringement action to protect its rights in software, there is no need to create such a sweeping duty from whole cloth. Because the express language of the Contract does not establish a duty of care, none exists.

(Gov't br. at 25) Based on the precedent discussed above, we find the government's argument unpersuasive and decline to follow it. We hold that in the circumstances of a contract for a single-use software license, an implied duty exists that the licensee will take reasonable measures to protect the software, to keep it from being copied indiscriminately, which obviously could have a deleterious effect on the ultimate value of the software to the licensor. General support for such a conclusion is found in the Supreme Court's opinion

25

in *United States v. Bostwick,* 94 U.S. 53, 65-66 (1876), which involved a dispute over the terms of a lease agreement. The Supreme Court stated:

> [I]n every lease there is, unless excluded by the operation of some express covenant or agreement, an implied obligation on the part of the lessee to so use the property as not to unnecessarily injure it.... This implied obligation is part of the contract itself, as much so as if incorporated into it by express language. It results from the relation of landlord and tenant between the parties which the contract creates.

*See also A&B Ltd. Partnership v. GSA,* GSBCA No. 15208, 04-1 BCA ¶ 32,439 at 160,504-05. We see no reason why a similar duty should not be applicable to software licenses, which resemble leases to some degree in that only a limited use of the property, rather than its entirety is being conveyed. We hold that in every software license, as part of the implied duty of good faith and fair dealing there is an implied obligation on the part of the licensee to use the property in a manner so as to not unnecessarily damage the software's value to the licensor. This duty would necessarily include taking reasonable measures to protect it from being copied indiscriminately in the case of single use licenses.

The government also argues, citing *Metcalf Constr. Co. v. United States,* 742 F.3d 984, 991 (Fed. Cir. 2014); and *Century Exploration New Orleans, LLC v. United States,* 745 F.3d 1168, 1179 (Fed. Cir. 2014), that it would be improper to impose an implied obligation upon it because it would change, or exceed, the duties expressly set forth in the contract (gov't br. at 26). The government failed to explain how this implied duty would conflict with, exceed, or otherwise alter the express provisions of the contract, particularly in light of the government's argument the contract imposed no duties on the government. We do not agree that the implied duty would have the effect the government argues it would have. With regard to its assertion the government breached the contract by permitting others to copy the software we find that appellant has met the second element of a breach of contract claim, i.e., the government has an implied duty to take reasonable measures to protect single-use license software from being copied and distributed to others.

We also find appellant met the second element of a breach of contract claim with respect to its assertion the government failed to maintain a point of contact during performance of the contract. It is self-evident that a party's performance of a contract could require communication with the other party to the contract and that the failure to facilitate same, by maintaining a point of contact, could be a breach of the implied duty of good faith and fair dealing through a lack of cooperation. *Precision Pine & Timber, Inc. v. United States,* 596 F.3d 817, 820 n.1 (Fed. Cir. 2010) (duty to cooperate is part of the implied duty of good faith and fair dealing).

Next we consider whether appellant has satisfied the third element of a breach of contract claim, that the government breached a duty under the contract. We find that appellant has done so with two of its breach claims, but has not with respect to the remaining two. Appellant has not proven the government breached the implied duties we have found to exist within the contract. With respect to the assertion that the government failed to maintain a point of contact, appellant's evidence relates primarily to the contracting officer and the difficulties it had communicating with him. The record indicates appellant's efforts to contact the contracting officer occurred mostly in 2013, well after the contract's one-year performance period, as asserted by appellant. (Findings 28, 34) Even if we were to accept this evidence as proof of a failure to cooperate, appellant has offered no authority for the proposition that the government must continue to cooperate after the contract's performance period and we are unaware of any such authority. We have held previously that the duty to cooperate does not arise unless there is a contract in existence. *CAE USA, Inc.*, ASBCA No. 58006, 13 BCA ¶ 35,323 at 173,390-91. We see no reason to extend this duty into a period appellant contends is beyond the contract's performance period. In any event, we do not accept the evidence of appellant's difficulties in reaching the contracting officer as proof the duty to cooperate was breached. The record indicates appellant's difficulties in reaching the contracting officer were due to his not being present at the time appellant attempted to reach him, first due to time-off for Christmas and subsequently to his having left the country because his tour of duty had been completed. (Findings 28, 34) There is no evidence that there was any purposeful effort on the part of the government to avoid communicating with appellant or other wrongful conduct that would establish the duty to cooperate had been breached in relationship to the contracting officer. Furthermore, the contract indicated that MAJ Wirey was the point of contact and the record includes no evidence that appellant made any attempt to contact him until late 2012, and then only once. The record is unclear whether he was still present in Afghanistan at this time. (Finding 34) This attempt to contact MAJ Wirey also occurred beyond the end of the performance period of the contract as asserted by appellant and again does not prove any wrongful action by the government to avoid communicating with appellant, particularly as it involves only a single attempt at communication. The record does not support finding the government breached the duty to cooperate with appellant as asserted.

Nor has appellant established that the government breached the implied duty to take reasonable measures to protect the software from being copied. We understand appellant is relying on the following facts to make its case with respect to this element of the breach of contract: that copies of the software appeared for sale in Afghanistan and Iran, the email conversation it had with LT Huang and more importantly on the testimony of Mr. Aminy regarding the copies he witnessed being installed on his own and his colleagues laptops. (Findings 29-31, 33) None of this evidence establishes that the government failed to take reasonable measures to keep the software from being copied. First, appellant never established what the government did, or did not do with

27

the software after it was received. Despite evidence in the record that the software would have been given to the logistics and supply office to distribute and then to the communications personnel to install, appellant provided no evidence regarding what these offices did or did not do with respect to the software. (Finding 25) The evidence relating to appellant's communication from LT Huang does not support finding the contract was breached. Instead, if anything, it tends to support that government personnel were mindful of the software license and were acting appropriately. Although LT Huang was aware that the 2nd/101 BCT had a copy of the software, she contacted appellant to obtain information regarding same. This is evidence of an appropriate action, not an improper one. Similarly, the fact that copies appeared in markets in Afghanistan and Iran does not necessarily indicate any responsibility on the government's part. Appellant failed to introduce any evidence tracking the software subsequent to the point of MAJ Wirey's receipt in October 2010 and what the government did or did not do to protect it. Appellant has conceded the software could have been stolen. (Finding 40) The government argues that appellant is seeking to impose strict liability on it for the alleged unauthorized copying (gov't br. at 22-23). Although appellant does not make this argument expressly, it has failed to provide any evidence of any fault or failure on the part of the government. It is as if appellant assumes that it has no burden of proving anything more than that the software was delivered and subsequently misused, which is very much like a strict liability approach. Appellant has cited no authority for holding the government to a strict liability standard, a tort concept, and we decline to adopt same with regard to the performance of contractual duties.

With respect to Mr. Aminy's testimony, the record indicates only that he witnessed an unspecified number of copies being installed on his and his colleague's computers (finding 30). There is no evidence that more than the 17 unaccounted for copies of the software were installed, or that the copies he witnessed being installed were not part of these 17 unaccounted for copies that had been licensed to the government, or that they were being installed without the government's knowledge and approval. Despite being aware of the names of supervisory personnel from Mr. Aminy's employer, or previous employer, who potentially could have provided evidence regarding the number of copies that were installed and whether it was being done with the government's knowledge and approval, or if without same, and how they came into possession of the software, appellant elected not to provide any evidence from these individuals. (Findings 30, 32) Appellant's complaint, which pleads that it will make the names and addresses of these individuals available to the government suggests that it assumed this burden belonged with the government (59519, compl. at 4-5). Appellant's complaint includes allegations that hundreds of copies were installed, but the evidence appellant has included in the record do not support this (id.). Allegations made in a complaint do not constitute proof. *Swanson Group, Inc.*, ASBCA No. 47677, 96-2 BCA ¶ 28,565.

28

> Appellant has presented no evidence to support its allegations and all of its important allegations have been denied thus putting them in issue.... The Board has held on many occasions that claim letters and pleadings are not proof of disputed facts.

*William G. Knight, d/b/a K&E Bus Line*, ASBCA No. 10783, 65-2 BCA ¶ 5099 at 24,021 (citing *C.W. Hilton*, ASBCA No. 10263, 65-1 BCA ¶ 4766). Consequently, all of appellant's breach of contract claims based on the breach of an implied duty must also fail because appellant has not provided any evidence that there was a breach of these duties.

We turn now to the other two breach claims, relating to the assertions that a single copy of the software was installed on more than one computer and that the government failed to provide appellant with a list of activations or registered users. We find appellant has proven that the government installed a single copy of the software on more than one computer. The evidence establishes that a single copy of the software was registered to two separate computers and that the registrations were linked to SPC Sahar's official army email address. (Findings 17, 27) Although SPC Sahar testified he did not recall ever having installed software, this does not rule out the possibility that he did, or that someone from the communications shop had installed the software on his behalf and does not explain the registrations associated with his official government email address. We find appellant has satisfied the third element in this instance, which the government failed to rebut. The assertion that the government failed to provide appellant with a list of the activations or registered users was also unrebutted. (Findings 28, 32, 36) The government's sole defense to this claim was that it had no such duty. Accordingly, appellant has also established the government breached a duty with respect to this asserted claim.

The fourth element of a breach of contract claim, damage, also needs to be established by appellant with respect to these last two breach claims. It does not matter that the appeal has been bifurcated in accordance with the Board's standard practice. Appellant must present some evidence that it was damaged by the governmental actions of which it complains even in a hearing which is limited to the issue of liability. As stated by the court in *Puritan Associates,* 215 Ct. Cl. 976, 978 (1977):

> Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions....

*See also Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605-06 (Ct. Cl. 1971). We find appellant has satisfied this element. It has proved the government installed a duplicate copy

29

on more than one computer, which damaged appellant by depriving it of the license fee the government would have had to otherwise pay to obtain a valid copy of the software. The government's failure to provide appellant with the list of activations or registered users may have damaged appellant by undermining its ability to have proven that more copies of the software than were licensed were used by the government.

## CONCLUSION

ASBCA No. 59519 is dismissed for lack of jurisdiction. With regard to ASBCA No. 59913, we find the government has breached the contract by violating the terms of the license agreement in two respects: it permitted the installation of a single copy of the software onto more than one computer and it failed to provide appellant with a list of the registered users. We sustain the appeal in this regard. In all other respects the appeal is denied. The appeal is remanded to the parties for resolution of the damages due appellant stemming from its properly-certified claim dated October 23, 2014.

Dated: June 27, 2018

CHRISTOPHER M. MCNULTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59519, 59913, Appeals of CiyaSoft Corporation, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals